IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FRED MOSLEY, M.D.,

       Plaintiff,

vs.                                                                    No. CIV 09-0794 JB/WDS

VICTOR TITUS, STEPHEN MURPHY, and
TITUS & MURPHY, LLC,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed July 21, 2010 (Doc. 50). The Court held a hearing on October 15, 2010. The primary issues are: (i) whether Plaintiff Fred Mosley, M.D., has established a genuine issue of material fact whether Defendant Victor Titus, a lawyer, engaged in malicious abuse of process when he filed claims against Mosley without probable cause, when there is evidence that Titus believed that Mosley was engaging in improper ex parte contacts with employers and insurers as well as evidence that Titus wanted to run Mosley out of town; (ii) whether Titus owed Mosley, the defendant in the underlying cases, a duty to exercise reasonable care and negligently breached that duty; (iii) whether Titus filed the lawsuits against Mosley without sufficient justification and with intent to injure, and is liable for prima-facie tort; (iv) whether Titus intentionally inflicted emotional distress on Mosley; and (v) whether the undisputed facts establish damages claims. The Court grants the Defendants' Motion for Summary Judgment, because it finds that Mosley has failed to establish a genuine issues of material fact and that Mosley's claims for malicious abuse of process, negligence, prima-facie tort, intentional infliction of emotional distress, and damages fail as a matter

of law.

**FACTUAL BACKGROUND**

Titus is an attorney in Farmington, New Mexico.  See Curriculum Vitae of Victor A. Titus,

filed July 21, 2010 (Doc. 51-10).[1]   In his law practice, Titus primarily represents workers in

proceedings under the New Mexico Workers' Compensation Act, NMSA 1978, §§ 52-1-1 to -70.

See Curriculum Vitae of Titus at 1.  In 1997, Mosley began practicing medicine in Farmington.  See

Complaint for Malicious Abuse of Process, Negligence, Interference with Contractual Relations,

Violation of NMSA § 57-1-1 et. seq., Intentional Infliction of Emotional Distress and Prima Facie

Tort ¶¶ 7-9, at 2, filed August 13, 2009 (Doc. 1)("Complaint").  Mosley opened his own practice,

known as Mesa Occupational and Sports Medicine.  See Complaint ¶ 9, at 1.  A substantial part of

Mosley's practice was treating workers who were injured on the job and receiving workers'

compensation benefits.  See id. ¶¶ 7-9, at 2.  Over the years, as Mosley practiced medicine in

Farmington, several of his patients were also Titus' clients.  See id. ¶ 13, at 2.[2]  Titus knew that his

---

[1] Mosley did not respond to the Defendants' assertion of this fact, so the Court deems this fact admitted.  D.N.M.LR-Civ.56.1(b) states:

> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M. LR-Civ. 56.1(b)(emphasis added).

[2] At the hearing, the Court asked counsel whether Titus and Mosley had some business relationship, informal or otherwise, where they referred clients/patients to each other; whether they worked together to maximize their profits; and then had a falling out.  Titus' attorney, Emily Franke, stated: "[T]here was no referral relationship. . . .  They just happened to have Dr. Mosley's patients some of them were Mr. Titus' clients and vice versa."  Transcript of Hearing at 8:4-13 (taken October 15, 2010)(Court, Franke)("Tr.")(the Court's citations to the transcript refer to the court

client's employers directed his clients to Mosley for care and treatment following accidental on-the-

job injuries.  See Deposition of Fred Mosley at 107:13-24 (taken June 10, 2010), filed July 21, 2010

(Doc. 51-5).[3]   Mosley considered both objective evidence and subjective evidence -- such as a

worker's allegations of continuing pain -- when making his return-to-work recommendations to

avoid abuse of the workers' compensation system.  See Mosley Depo. at 37:3-38:4.[4]

When patients would arrive at Mesa Occupational and Sports Medicine, the receptionist

would give them a packet of paperwork to fill out, which included a release, which, when signed,

purported to permit Mosley to contact his patients' employers,  see Authority to Release Medical

---

reporter's original, unedited version; any final transcript may contain slightly different page and/or
line numbers).

[3] The Defendants assert this fact in their Supplemental Brief of Defendants in Support of
Motion for Summary Judgment.  See Supplemental Brief of Defendants in Support of Motion for
Summary Judgment at 6, filed October 21, 2010 (Doc. 75)("Supplemental Brief").  Mosley has not
disputed this fact, see D.N.M.LR-Civ.56.1(b), and the evidence to which the Defendants have cited
in support of this fact supports their assertion.  No evidence in the record calls this assertion into
question.  The Court will therefore treat this fact as true.

[4] The Defendants assert that "Mosley believed that continuing pain was not disabling and
advised employers that workers could return to work despite ongoing pain."  Memorandum at 3
(citing Mosley Depo. at 36:18-37:20; Deposition of Miranda McPherson at 9:3-11:25 (taken June
21, 2010), filed July 21, 2010 (Doc. 51-4); Rivera Depo. at 6:17-9:23).  Mosley disputes this fact
to the extent it might be read to mean that he always advised workers with continuing pain to return
to work.  See Response at 3. Mosley contends that he weighed both subjective and objective
evidence to avoid abuse of the workers' compensation system.  See Response at 3 (citing Mosley
Depo. at 36:22-38:4 ("I think . . . function is more important than . . . pain perception.  If somebody
comes in and they can . . . lift 30 pounds and twist and turn . . . . -- but says, 'My gosh, the pain is a
ten out of ten,' I tend to believe what I can see as opposed to what he states.")).  To the extent that
Mosley disputes the substance of the Defendants' assertion, and not just the semantics, the Court
will accept as true Mosley's version of this fact, because the Court must treat Mosley's version of
the facts as true, and finds that, even assuming these statements are true, Mosley has not established
a genuine question of material fact.  See Hunt v. Cromartie, 526 U.S. at 550-55 (stating that the
court must resolve all reasonable inferences and doubts in favor of the non-moving party, and
construe all evidence in the light most favorable to the non-moving party).

Reports and Information, filed July 21, 2010 (Doc. 51-5).[5]  If a patient had a question about one of

the forms, Mosley or a member of his staff would discuss the form with the patient.  See Mosley

Depo. at 67:9-69:17.[6]  In 1998, and at present, New Mexico law prohibited ex parte contact between

a worker's treating physician and the worker's employer or insurer absent the worker's knowing and

informed consent to the ex parte contact.  See Deposition of Helen Stirling at 57:22-60:22 (taken

June 28, 2010), filed July 21, 2010 (Doc. 51-8).[7]

In approximately 1998, Titus learned that Mosley was engaging in ex parte contacts with the

---

[5] Because Mosley failed to dispute the facts in paragraphs 1-5 of the Defendants'
Memorandum in Support of Motion for Summary Judgment, filed July 21, 2010 (Doc.
51)("Memorandum"), the Court will treat these facts as admitted.  See D.N.M.LR-Civ.56.1(b).

[6] The Defendants assert that "[t]he release being used by Mosley was part of a packet of
papers each patient signed, and was not explained to the workers by Mosley or anyone at Mesa
Occupational and Sports Medicine."  Memorandum at 2 (citing Mosley Depo. at 62-69).  Mosley
responds that, if a patient had a question about the forms they were signing, he or his staff would
discuss the forms with the patient.  See Response at 2 (citing Mosley Depo. at 69:8-17 ("If somebody
had a question, we would read [the release] to them . . . . [W]e tried to have a form, but sometimes
when we had people coming in . . . I'm sure that there were some missed, but if they had a question,
we would sit down and talk to them.").  Because the Court must treat Mosley's version of the facts
-- if supported by admissible evidence -- as true, and finds that, even assuming his version of the
facts are true, Mosley has not established a genuine question of material fact, the Court will treat
Mosley's version of this fact as true.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999)(stating
that the court must resolve all reasonable inferences and doubts in favor of the non-moving party,
and construe all evidence in the light most favorable to the non-moving party).  The Court of
Appeals of New Mexico has distinguished disputed facts in an underlying proceeding and disputed
facts that create a genuine issue of material fact precluding summary judgment in a malicious-abuse-
of-process proceeding.  The Court of Appeals has found that disputed facts in an underlying
proceeding did not, based on the undisputed facts before them, negate the defendants' probable
cause to file the lawsuit.  See Guest v. Berardinelli, 145 N.M. 186, 193, 195 P.3d 353, 360 (Ct. App.
2008)("We hold that the determination by a jury of any of the above [disputed] facts would not
negate Defendants' probable cause to file suit based upon the remaining undisputed facts before
them at the time of filing.").  Similarly, in this case, the disputed facts relating to the underlying
lawsuit do not create a genuine issue of material fact, and therefore will not preclude summary
judgement.

[7] Because Mosley failed to dispute this fact, the Court will treat the fact as admitted.  See
D.N.M.LR-Civ.56.1(b).

employers of Titus' clients.  See Letter to Dr. Fred Mosley from Victor A. Titus (dated March 26,

1998), filed July 21, 2010 (Doc. 51-10).  Also in 1998, Titus sent Mosley two letters, in which he

advised Mosley that his ex parte contacts with his patient's employers was improper and, on behalf

of Titus' clients, demanded that Mosley cease any further ex parte contacts.  See Letter to Dr. Fred

Mosley from Victor A. Titus (dated January 9, 1998), filed July 21, 2010 (Doc. 51-10)("Jan. 9

Letter").[8]  From 1998 to 2008, Mosley continued to engage in ex parte contacts with the employers

of injured workers whom Titus represented.  See Deposition of Guillermo Rivera at 6:22-7:8 (taken

June 22, 2010), filed July 21, 2010 (Doc. 51-6).[9]  Several of Titus' clients were unhappy with

Mosley; many did not want Mosley speaking to their employers or insurers and, in some cases, told

---

[8] The Defendants assert that, "[a]round January and March, 1998, Titus advised Mosley that
the ex parte contacts with employers of his clients were improper and, on behalf of his clients,
demanded that Mosley cease any further ex parte contacts."  Memorandum at 3.  Mosley responds:

> [W]hile it is true Titus sent a letter to Dr. Mosley stating that it was illegal to have
> oral communications with employers, this was a misstatement of the law as there is
> no authority for the proposition that a physician cannot discuss a worker's injury or
> work limitation with the employer with the worker's consent.  Furthermore, when
> the letters referenced in Paragraph 8 of Defendants' [statement of material facts]
> were sent, most of the plaintiffs on behalf of whom Titus would eventually sue Dr.
> Mosley had neither been treated by Dr. Mosley nor retained Titus.

Response at 2.  Mosley does not dispute the Defendants' assertion that Titus advised Mosley that
ex parte contact with employers was improper; he solely contends that Titus mis-interpreted the law.
The Court accepts the Defendants' assertion that Titus advised Mosley that his ex parte contacts
were improper as true, because Mosley has failed to specifically controvert the Defendants'
statement of fact with a denial or counter-statement that meets the substance of the Defendants'
statement; instead he has "intermixed [his] response[] . . . with legal argument[]."  Mitchael v.
Intracorp, Inc., 179 F.3d 847, 856 (10th Cir. 1999).  Furthermore, Mosley's response that, when the
letters were sent, he had not yet treated most of the plaintiffs on behalf of whom Titus would sue
attacks only the Defendants' semantics, without disputing the substance of the assertion.  Mosley
therefore has failed to specifically controvert the evidence that the Defendants set forth.
Accordingly, the Court treats this fact as admitted.  See D.N.M.LR-Civ.56.1(b).

[9] Because Mosley failed to dispute this fact, the Court treats the fact as admitted.  See
D.N.M.LR-Civ.56.1(b).

Mosley they did not want him to speak to their employers or insurers.  See Deposition of Laurie Lynn Bible at 24:25-26:5 (taken July 16, 2010), filed August 3, 2010 (Doc. 57-1).[10]  Mosley's ex parte contacts with employers and insurers resulted in adverse employment consequences for Titus' clients, including loss of worker's compensation benefits, and, for some, even loss of their jobs.  See Deposition of Terry D. Black at 28:1-31:17 (taken June 30, 2010), filed July 21, 2010 (Doc. 51-1).[11]

_____

[10]  The Defendants assert this fact in their Supplemental Brief.  See Supplemental Brief at 6.  Mosley has not disputed this fact, and the evidence to which the Defendants have cited in support of this fact supports their assertion.  See D.N.M.LR-Civ.56.1(b).  No evidence in the record calls this assertion into question.  The Court will therefore treat this fact as true.

[11]  The Defendants assert that Mosley's ex parte contacts resulted in adverse employment consequences for Titus' clients.  See Memorandum at 3 (citing Rivera Depo. at 6:17-9:23; Deposition of Sherry Thomason at 9:21-10:17 (taken July 15, 2010), filed August 3, 2010 (Doc. 57-4); Deposition of Troy Rightmire at 7:17-12:9 (taken July 15, 2010), filed August 3, 2010 (Doc. 57-3); Deposition of Kevin Larry at 10:1-11:12 (taken July 15, 2010), filed August 3, 2010 (Doc. 57-2), Black Depo. at 28-31).  Mosley responds that there is no evidence that his ex parte contacts caused any adverse consequences for his patients.  See Response at 3 (citing McPherson Depo. at 22:1-23:18).  Mosley states that, "[f]or example, Miranda McPherson agrees that she did not have a problem with Dr. Mosley communicating with her employer.  She simply complained that Dr. Mosley recommended she return to work before she wanted to go back to work."  Response at 3 (citing McPherson Depo. at 22:1-23:18).  What this portion of her deposition shows is that McPherson stated that she was upset because Mosley spoke to her employer and then released her to full duty.  See McPherson Depo at 22:15-23:14.  She expounded on this statement in another portion of her deposition that the Defendants provided.  In this other portion of her deposition, she stated that it was her understanding that, when Mosley spoke to her employer, her employer informed Mosley that the insurance company was not going to pay for further treatment, so Mosley fully released her back to work although she still could not bend her knee.  See McPherson Depo. at 9:18-10:25.  McPherson's testimony therefore does not controvert the Defendants' assertion that Mosley's ex parte contacts caused adverse employment consequences for the employees.  See Scott v. Harris, 550 U.S. 372, 380 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Rhoads v. Miller, 352 F. App'x 289, 291 (10th Cir. 2009)("Here, there is no . . . evidence in the record to blatantly contradict [the plaintiff's] testimony.  There is only other witness' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.")(footnote and citation omitted).  Cf. United States v. Hillhaven Corp., 960 F. Supp. 259, 262 (D. Utah. 1997)(stating that a party's witness did not create a genuine issue of material fact precluding summary judgment by contradicting herself).

The Defendants have cited some evidence that cannot be used in support their summary

Beginning in March 2001, on behalf of several of his clients, Titus filed complaints against Mosley in the State District Court in Farmington, New Mexico, seeking to prevent Mosley from engaging in further ex parte contacts and to recover damages for the harm caused to Titus' clients by the ex parte contacts.  See Rightmire v. Mosley Case Detail,[12] D-1116-CV-200100215, filed August 5, 2010 (Doc. 59-4).[13]  In his deposition, Titus testified:

> I [told my clients] that the law in New Mexico went to a certain point on privilege -- physician/patient privilege and what you could and couldn't do.  But it was unclear as to what the remedy was for a violation and whether or not the causes of action that I had brought or proposed would be acceptable to the court in all or in part; and if any one of those was acceptable to the court, what damages would be awardable if any.

See Deposition of Victor A. Titus at 71:25-72:8 (taken June 30, 2010), filed August 5, 2010 (Doc.

---

judgment motion -- Thomason alleged that a supervisor at her former job told her that Mosley told the supervisor that Thomason was 100 percent able to return to work even though Thomason was still attending therapy.  See Thomason Depo. at 9:21-10:17.  Because this statement is apparently being offered for the truth of the matter asserted, and because this former supervisor is not a party, this statement is not admissible in support of a summary judgment motion, because it is hearsay evidence and there is not an apparent exception.  See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995)("Today, we align ourselves with this line of authority and hold that Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment.").  Although Thomason's testimony cannot be used to support the Defendants' assertion that Mosley's ex parte contacts resulted in adverse employment consequences for Titus' clients, the Defendants have directed the Court's attention to other evidence in the record that supports this assertion.  Because Mosley has failed to direct the Court's attention to evidence that controverts the evidence that the Defendants put forth, the Court will treat this fact as admitted.  See D.N.M.LR-Civ.56.1(b).

[12] In New Mexico, the public can go to www.nmcourts.gov and print out a document that details the actions taken in a case -- a case detail.  Both parties submitted a case detail for Rightmire v. Mosley, but the Court will cite to the case detail that Mosley submitted, as the Defendants did not submit the full case detail.

[13] Because Mosley fails to dispute this fact, the Court will treat the fact as admitted.  See D.N.M.LR-Civ.56.1(b).

59-3).[14]  Titus' clients were aware of and consented to the filing of verified complaints on their

behalf.  See McPherson Depo. at 11:1-13:24.[15]  Titus' clients understood Titus filed the lawsuits to

stop Mosley's ex parte contacts, to get medical treatment, and to obtain compensation for their

losses.  See Thomason Depo. at 18:15-21:10.[16]  After the lawsuits were filed, some additional

_____

[14] Mosley asserts that Titus knew that there was no cause of action for the claims that he made in the lawsuits against Mosley.  See Response at 5 (citing Titus Depo. at 28:22-29:22, 71:20-72:17).  The Defendants respond that Mosley mischaracterizes Titus' testimony and that the testimony creates no genuine issues of material fact.  See Reply at 3.  The fairest reading of Titus' testimony is that he thought New Mexico law on a cause of action and a remedy for the violation of doctor-client privilege was unclear, and not that neither existed.  See Titus Depo. at 71:12-16 ("Well, we discussed . . . the cause of action, the potential damages, whether or not there were damage, or even a cause of action that would be allowed as a remedy to what I thought was a wrong.  And that that [sic] law was very unclear in New Mexico.").  Because the Court finds that the dispute over Mosley's assertion goes to semantics, and not substance, the Court will accept this assertion as admitted.  See D.N.M.LR-CIV.56.1(b).

[15] Because Mosley failed to dispute this fact, the Court will treat the fact as admitted.  See D.N.M.LR-Civ.56.1(b).

[16] The Defendants assert that "Titus's clients understood the reason for filing of the lawsuits to be to stop the ex parte contacts and to get medical treatment and to obtain compensation for their losses."  Memorandum at 4 (citing McPherson Depo. at 16; Rivera Depo. at 7-8; Deposition of Jana McKinney at 12-18 (taken June 22, 2010), filed July 21, 2010 (Doc. 51-3); Thomason Depo at 18-19, 20; Rightmire Depo. at 13-14; Larry Depo. at 12, 20-24; Bible Depo. at 24-27; Black Depo. at 25).  Mosley responds that not all of Titus' clients understood why they were suing Mosley.  See Response at 3 (citing McPherson Depo. at 22-23; Thomason Depo. at 9; Bible Depo. at 8).  Mosley states that McPherson had no issue with Mosley talking to her employer and that she only did not want to go back to work as Mosley recommended.  See Response at 3.  This characterization does not accurately describe McPherson's testimony.  In the deposition, McPherson testified that she understood the purpose of the lawsuit.  See McPherson Depo. at 11:22-23.  She testified that the purpose of the lawsuit was to make Mosley responsible for his actions -- such as his contact with her employer, because as a result of his contact, she had to return to work although she could not bend her knee, and she was denied workers' compensation benefits.  See McPherson Depo. at 9:23-11:25.  This testimony therefore does not controvert the Defendants' assertion.  Similarly, Mosley asserts that Bible believed she was suing Mosley for medical malpractice.  See Response at 3.  When counsel asked Bible whether she was suing Mosley for medical malpractice, Bible stated that she thought so, but when counsel later asked Bible whether part of the lawsuit was a claim that Mosley should stop talking to her adjuster, Bible testified that she understood the ex parte contact to be reason for Titus' representation and the reason for getting involved in the lawsuit.  See Bible Depo. at 8:24-9:1; id. at 27:9-29:10.  This testimony therefore does not controvert the Defendants'

workers that Titus represented sought to intervene in the lawsuits.  See Rivera Depo. at 7:2-9:23.[17]

Titus stated that he wanted to run Mosley out of town.  See Stirling Depo. at 97:17-25.[18]

Black executed a signed statement under oath at Mosley's request which stated that he had not

consented to the filing of the Complaint and that the purpose of the complaints was to run Mosley

out of town.  See Statement of Terry D. Black (dated December 4, 2008), filed July 21, 2010 (Doc.

51-1).  In his subsequent deposition, Black testified that Mosley bribed him to make the Statement,

and that the Statement is false.  See Black Depo. at 32:2-34:19, 39:12-47:20.

On June 14, 2001, Titus proposed a compromise settlement to Mosley's counsel, in which

Titus sought an agreement to: (i) a permanent injunction preventing Mosley's office from engaging

in ex parte contact with worker's employers, insurers and case managers, and preventing Mosley's

---

assertion.  Cf. United States v. Hillhaven Corp., 960 F. Supp. at 262 (stating that a party's witness did not create a genuine issue of material fact precluding summary judgment by contradicting herself).  Finally, Mosley asserts that Thomason thought she was suing Mosley because she was unhappy with how her injury was treated.  See Response at 3.  Although this statement represents part of Thomason's testimony, Thomason also testified that one of the reasons she sued Mosley was because Mosley spoke to her employer and told her employer that she was 100 percent able to go back to work even though she was still in therapy, which resulted in the loss of her job. See Thomason Depo. at 18:15-19:19.  This testimony therefore does not controvert the Defendants' assertion.  Because the deposition testimony to which Mosley points fails to controvert the Defendants' assertion that Titus' clients understood the lawsuits was filed to stop the ex parte contacts, to get medical treatment, and obtain compensation for their losses, the Court will reject Mosley's arguments and will deem this fact to be admitted.  See D.N.M.LR-Civ.56.1(b).

[17] Because Mosley fails to dispute this fact, the Court will treat the fact as admitted.  See D.N.M.LR-Civ.56.1(b).

[18] Mosley disputes this fact to the extent that it implies that witnesses were testifying to rumors or gossip that they heard.  See Response at 4.  Because Mosley's argument goes to the semantics of the Defendants' assertion, and not the substance, the Court finds that Mosley has not controverted this fact and will treat this fact as admitted.  See D.N.M.LR-Civ.56.1(b).  These statements are statements "other than one made by the declarant while testifying . . . offered in evidence to prove the truth of the matter asserted," see Fed. R. Evid. 801(c), but they are admissible as admissions by a party-opponent, see Fed. R. Evid. 801(d)(2).

office from using the release form; (ii) a provision that violation of the injunction could be sanctioned as contempt of court; (iii) the plaintiffs' waiver of all compensatory and punitive damages; and (iv) Mosley's payment of the plaintiffs' filing fees and service fees, with each side to pay its own attorney fees.  See Letter from Victor A. Titus to Seth V. Bingham, Esq. and Terri L. Sauer, Esq. (dated June 14, 2001), filed July 21, 2010 (Doc. 51-10).[19]  On approximately November 6, 2002, Titus sent a letter to Mosley's attorney stating that he was generally agreeable to dismissing the lawsuits against Mosley if Mosley would sell his medical practice and leave Farmington.  See Letter from Victor A. Titus to Terry Beach, Esq. (dated November 6, 2002), filed August 5, 2010 (Doc. 59-3).  In the approximately seven years that the lawsuits against Mosley were pending, Titus did not request a trial setting or take any depositions; the only written discovery he served was a single set of interrogatories and requests for production on behalf of one of the thirteen plaintiffs.  See Rightmire v. Mosley Case Detail.[20]

On February 1, 2007, the sale of Mosley's medical practice of Mesa Occupational and Sports Medicine to Reliance Medical Group, which was owned by Ken Stradling, M.D., closed.  See First Amendment to Agreement of Purchase and Sale of Assets, filed August 5, 2010 (Doc. 59-3).[21]

---

[19] Because Mosley fails to dispute the facts in paragraphs 17-19 of the Defendants' Memorandum, the Court will treat the facts as admitted.  See D.N.M.LR-Civ.56.1(b).

[20] The Defendants argue that the facts in paragraphs 2-3 of Mosley's Response are not material to the question whether Titus had probable cause to file the lawsuits and does not create any genuine issues of material fact.  See Reply at 4.  Because the Court must treat Mosley's version of the facts as true and concludes that, even assuming these statements are true, Mosley has not established a genuine question of material fact, the Court will treat these facts as true.  See Hunt v. Cromartie, 526 U.S. at 550-55.

[21] The Defendants assert that Mosley sold his medical practice in 2006.  See Memorandum at 5.  Mosley responds that the sale closed on February 1, 2007.  See Response at 4. Because the Court must treat Mosley's version of the facts as true and finds that, even assuming that Mosley's version of the facts are true, Mosley has not established a genuine question of material fact, the

Mosley's and Stradling's accountants arrived at the valuation of Mosley's practice. See Deposition of Ken Stradling at 20:17-23:13 (taken June 22, 2010), filed July 21, 2010 (Doc. 51-9). The valuation by Mosley's accountant was based on assumptions that Mosley gave the accountant and did not meet the standards under the Uniform Standards for Professional Appraisers. See Deposition of Kenneth W. Shields, CPA at 55:1-59:11 (taken June 7, 2010), filed July 21, 2010 (Doc. 51-7).[22] The lawsuits were not a factor in the negotiations for the sale of Mosley's practice or in the purchase price that Reliance Medical paid for Mosley's practice. See Stradling Depo. at 33:11-23; id. at 62:10-17.[23] Mosley had no contracts with any employers or insurers and he did not lose any patients as a result of the lawsuits, although he did lose some patients to competition from other medical providers. See, e.g. Mosley Depo. at 111:16-116:19; id. at 14:13-24.

In 2007, Mosley left Farmington and moved to Grand Junction, Colorado. See Mosley Depo. at 6:4-13.[24] A few months after Mosley left Farmington, Titus moved to withdraw as counsel for one of the plaintiffs, Toney Moore, who was left pro se and was dismissed from the lawsuit a

_____

Court will treat Mosley's version of the facts as true. See Hunt v. Cromartie, 526 U.S. at 550-55.

[22] Because Mosley fails to dispute the facts in paragraph 21 of the Defendants' Memorandum, the Court will treat these facts as admitted. See D.N.M.LR-Civ.56.1(b).

[23] Mosley contends that the lawsuits were a factor in the negotiations and the purchase price that Reliance Medical paid, because, although Stradling testified that the lawsuits were not a factor "in the negotiations for the purchase of Dr. Mosley's practice, he admitted that he discussed arranging a deal between Dr. Mosley and Victor Titus where Titus would dismiss the lawsuits if Dr. Mosley were to sell his practice and leave Farmington." Response at 4. Stradling testified that he had brief discussion with Titus in which he discussed the possibility of Mosley closing his practice, but he could not remember whether the discussion took place before or after Reliance sent an offer letter to Mosley. See Stradling Depo. at 41:21-43:3. Mosley has thus not controverted the Defendants' assertion that the lawsuits were not a factor in the negotiations, and the Court will thus treat this fact as true. See D.N.M.LR-Civ.56.1(b).

[24] Because Mosely fails to dispute the facts in paragraphs 25-27 of Defendant's Memorandum, the Court will treat these facts as admitted. See D.N.M.LR-Civ.56.1(b).

few days later.  See Rightmire v. Mosley Case Detail at 3-4.  In the following months, Titus either

agreed to have every claim dismissed with no recovery or he withdrew as counsel, leaving his clients

pro se.  See Rightmire v. Mosley Case Detail at 2-4.  By August 2008, every claim against Mosley

had been dismissed.  See Rightmire v. Mosley Case Detail at 2.[25]  Not all of the workers understood

why the lawsuits had been dismissed or that they had been dismissed.  See Bible Depo. at 14:9-

15:2.[26]

## PROCEDURAL BACKGROUND

On August 13, 2009, Mosley filed a Complaint against Titus, Steven Murphy, and Titus &

Murphy, LLC in the United States District Court for the District of New Mexico.  See Doc. 1.  In

his Complaint, Mosley alleges causes of action for malicious abuse of process, negligence,

interference with contractual relations, violation of the New Mexico Antitrust Act, NMSA 1978,

§§ 57-1-1 to -19, intentional infliction of emotional distress, and prima facie tort.  See Complaint

¶¶ 31-69, at 4-7.

On April 28, 2010, Murphy and Titus & Murphy, LLC, filed a Motion to Dismiss or, in the

_____

[25] The Defendants argue that the facts in paragraphs 4-5 of Mosley's Response are not
material to the question whether Titus had probable cause to file the lawsuits and does not create any
genuine issues of material fact.  See Reply at 4.  Because the Court must treat Mosley's version
of the facts as true and finds that, even assuming these statements are true, Mosley has not established
a genuine question of material fact, the Court will treat Mosley's asserted facts as true.  See Hunt
v. Cromartie, 526 U.S. at 550-55.

[26] The Defendants assert that the workers testified that they voluntarily dismissed the
lawsuits, because Titus had obtained the benefits they needed and because there was no further need
to continue the lawsuits.  See Memorandum at 6.  Mosley disputed this fact, pointing to Bible's
testimony that Titus did not discuss withdrawing as her counsel or discuss dropping the lawsuit with
her.  See Response at 4 (citing Bible Depo. at 14:3-17:18).  Because the Court must treat Mosley's
version of the facts as true and finds that, even assuming these statements are true, Mosley has not
established a genuine question of material fact, the Court will treat the fact as true.  See Hunt v.
Cromartie, 526 U.S. at 550-55.

Alternative, Summary Judgment.  See Defendants Titus & Murphy, LLC and Steven Murphy's Motion to Dismiss or, in the Alternative, for Summary Judgment, April 28, 2010 (Doc. 34).  Murphy and Titus & Murphy, LLC, also filed a Memorandum in Support of their Motion to Dismiss or, in the Alternative, for Summary Judgment.  See Memorandum in Support of Defendants Titus & Murphy, LLC and Steven Murphy's Motion to Dismiss or, in the Alternative, for Summary Judgment, filed April 28, 2010 (Doc. 35)("Murphy and Titus & Murphy, LLC's Memorandum").  Most of Mosley's claims were specific to Titus, except for his negligence claim, which included allegations against all of the Defendants.  See  Murphy and Titus & Murphy, LLC's Memorandum at 2-3.  Titus & Murphy, LLC argued that Mosley's Complaint against it failed to state a claim for relief, because Mosley made only a claim of negligence against Titus & Murphy, LLC, yet did not plead any facts that showed that Titus & Murphy, LLC, a real estate holding company, owed Mosley a duty, breached that duty, or caused Mosley any injury.  See  Murphy and Titus & Murphy, LLC's Memorandum at 5-6.  Both Murphy and Titus & Murphy, LLC argued that no genuine issue of material fact existed that would entitle Mosley to relief against them, because Mosley could not prove that either Defendant owed him a duty, or breached that duty.  See Murphy and Titus & Murphy, LLC's Memorandum at 6.

On August 5, 2010, the Court entered a Stipulated Order, which partially granted Murphy and Titus & Murphy, LLC's Motion to Dismiss or, in the Alternative, Summary Judgment by dismissing Titus & Murphy, LLC from the action.  See Stipulated Order Partially Granting Defendants Steven Murphy and Titus & Murphy, LLC's Motion for Summary Judgment and Dismissing Titus & Murphy, LLC, filed August 5, 2010 (Doc. 60).  On August 31, 2010, Murphy filed a Stipulated Notice, withdrawing the portion of Defendants' Motion to Dismiss or, in the Alternative, Summary Judgment, and Memorandum in support of this motion that related to him.

-13-

See Stipulated Notice to Withdraw Motion to Dismiss or, in the Alternative, for Summary Judgment by Defendant Stephen Murphy, filed August 31, 2010 (Doc. 67)("Stipulated Notice").   Murphy stated that, after further review and analysis, "it has been determined that sufficient questions of fact remain with regard to the status of [Murphy], which would require the Court to deny the Motion at this time."  Stipulated Notice at 1.

The Defendants -- currently only Titus and Murphy remain in the action -- move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment in their favor on all claims against them.  See Motion for Summary Judgment at 1.  The Defendants submitted a memorandum in support of their Motion for Summary Judgment.  See Memorandum in Support of Motion for Summary Judgment, filed July 10, 2010 (Doc. 51)("Memorandum").  As grounds for their motion, the Defendants state that there are no genuine issues as to any material fact and that they are entitled to summary judgment dismissing all claims in the case. See Memorandum at 1.  The Defendants assert that Titus acted properly in seeking to assert his client's constitutional right to access the courts and seek redress against Mosley for breach of the physician-patient privilege, and therefore all of Mosley's claims fail as a matter of law.  See Memorandum at 1.  The Defendants thus ask the Court to grant summary judgment on Mosley's claims for malicious abuse of process, negligence, antitrust violations, tortious interference with contract, prima-facie tort, intentional infliction of emotional distress, and damages.  See Memorandum at 23.  The Defendants assert that Murphy cannot be liable because he was not Titus' partner and was not involved in filing the lawsuits; to the extent the Complaint alleges causes of action against Murphy, however, he joins in seeking summary judgment on the claims Mosley has asserted.  See Memorandum at 1 n.1.

In his Response, Mosley concedes that his claim under the New Mexico Antitrust Act and his claim for tortious interference.  See Plaintiff's Amended Response to Defendants' Motion to

Summary Judgment (Doc. 50), filed August 5, 2010 (Doc. 59)("Response").  Mosley contends that his claim for malicious abuse of process should survive, because Titus filed thirteen claims against Mosley without probable cause and with a primary purpose of harassing Mosley to the point that Mosley would leave Farmington.  See Response at 7-8.  Mosley contends that his negligence claim should survive, because the general rule that a lawyer does not owe a duty to a party who is adverse to his client is qualified by the assumption that an attorney is acting legally and ethically, and whether Titus acted within the rules of professional ethics is a disputed fact.  See Response at 9-10.  Mosley argues that his prima-facie tort claim should survive, because the parties dispute whether Titus had sufficient justification to file the lawsuits.  See Response at 10.  Mosley also contends that his intentional infliction of emotional distress claim is viable, because there is a question of fact whether Titus' conduct was extreme and outrageous, and whether Mosley suffered severe emotional distress.  See Response at 11.  In conclusion, Mosley contends that the Court should not dismiss his damages claims, because he sold his practice for less than it was worth, and because if any of his intentional tort claims are successful, he will be entitled to punitive damages, as malicious abuse of process, prima-facie tort, and intentional infliction of emotional distress each require a finding that Titus acted intentionally and maliciously.  See Response at 11-12.

At the hearing, Eric Loman, attorney for Mosley, disputed the Defendants' assertion that Mosley had ex parte communication without his patients' consent.  See Tr. at 31:20-22 (Loman). Emily A. Franke, attorney for Titus, stated that the issue whether the release was sufficient would have been developed through discovery in the underlying litigation, but that the issue did not need to be definitely resolved before Titus could file the complaints.  See Tr. at 45:10-46:21 (Franke, Court).  The parties agreed to submit additional briefing on the meaning of informed consent.  See Tr. at 54:4-55:7 (Franke, Court, Loman).

-15-

On October 20, 2010, Loman submitted a letter to the Court, providing the Court with excerpts from the Workers' Compensation Handbook for New Mexico and the release that Mosley used. See Letter from Eric Loman to the Court (dated October 20, 2010), filed October 20, 2010 (Doc. 76)("Loman's Letter"). Loman also asserts that, under New Mexico contract law, a person acknowledges that he understands the meaning of a document when he signs the document. See Loman's Letter at 2. Loman represents that he could not find any New Mexico authority regarding the validity of a worker's consent to his physician's ex parte contacts. See Loman's Letter at 2.

On October 21, 2010, the Defendants submitted supplemental briefing. See Doc. 75. The Defendants stated: "There are no New Mexico cases that explore what is necessary for informed consent to waiver of the physician-patient privilege in the workers' compensation context." Supplemental Brief at 4. The Defendants therefore provided the Court with an overview of New Mexico law regarding informed consent and waiver in other contexts, including: (i) the validity and enforceability of consent to submit a dispute to arbitration, where courts examine the circumstances surrounding the consent, including the party's ability to understand the terms of the agreement and the bargaining power of the parties to determine whether the agreement to arbitration is an invalid adhesion contract; (ii) informed consent in the medical care and treatment context, where a doctor has a duty to disclose to the patient all facts necessary to form the basis of intelligent consent by the patient; (iii) releases of liability, where courts require the language in the release to be of such clarity that a person without legal training could understand it; and (iv) attorney disclosure of client information, which requires the client's consent after the attorney's full disclosure of any information sufficient for the client to make an informed decision. See Supplemental Brief at 4-5.

**LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT**

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).

        The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated §., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See

Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).   Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."   Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.   A mere "scintilla" of evidence will not avoid summary judgment.   Vitkus v. Beatrice Co., 11 F.3d at 1539.   Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.   "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.   If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."   Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).   Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.

See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## CHOICE OF LAW

When a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  In New Mexico, choice-of-law analysis is a two-step process.  See Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (Ct. App. 2006).  First, the Court must characterize the "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue."  Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  The next step is to apply New Mexico's choice-of-law rule.  See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.

In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place.  See Torres v. State, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995).  The place of the wrong is the location of the last act necessary to complete the injury.  See Torres v. State, 119 N.M. at 619, 894 P.2d at 390.  Where the elements of the underlying

claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (Ct. App. 1976).  The Supreme Court of New Mexico has said that it will not use the place-of-wrong-rule, however, if application of the rule would violate New Mexico public policy.  See Torres v. State, 119 N.M. at 619, 894 P.2d at 390.  The Court of Appeals of New Mexico has interpreted this principle to mean that, although there is a strong presumption in favor of application of the place-of-the-wrong rule, in some situations a court may depart from the general rule if another state has a more significant interest in having its law apply.  See Estate of Gilmore, 124 N.M. 119, 946 P.2d 1130 (Ct. App. 1997).

**RELEVANT NEW MEXICO LAW REGARDING MALICIOUS ABUSE OF PROCESS**

In DeVaney v. Thriftway Marketing Corp, 124 N.M. 512, 953 P.2d 277 (1998), overruled on other grounds by Durham v. Guest, 145 N.M. 694, 204 P.3d 19 (2009), the Supreme Court of New Mexico reviewed the purposes and elements of the two torts of abuse of process and malicious prosecution.  See DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 517, 953 P.2d at 282.  The Supreme Court of New Mexico concluded that the two torts would no longer be separate causes of action and restated their elements into a single tort -- malicious abuse of process.  See DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 518, 953 P.2d at 283.  In New Mexico, the tort of malicious abuse of process is disfavored, because of "the potential chilling effect on the right of access to the courts."  Fleetwood Retail Corp. of N.M. v. LeDoux, 142 N.M. 150, 156, 164 P.3d 31, 37 (2007)(citation omitted).  New Mexico courts state that the tort of malicious abuse of process should be construed narrowly to protect the right of access to the courts.  See Durham v. Guest, 145 N.M. at 701, 204 P.3d at 26; Weststar Mortg. Corp. v. Jackson, 133 N.M. 114, 119, 61 P.3d 823, 828 (2002).  Malicious-abuse-of-process claims involve balancing "the interest in protecting litigants'

right of access to the courts and the interest in protecting citizens from unfounded or illegitimate applications of the power of the state through the misuse of the courts." DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 517, 953 P.2d at 282. "[T]he filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive." DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 520, 953 P.2d at 285.

The elements of a malicious-abuse-of-process action are: (i) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (ii) a primary motive in the use of process to accomplish an illegitimate end; and (iii) damages. See Durham v. Guest, 145 N.M. at 701, 204 P.3d at 26. An improper use of process may be shown by: (i) filing a complaint without probable cause; or (ii) an irregularity or impropriety suggesting extortion, delay or harassment, or other conduct formerly actionable under the tort of abuse of process. See Durham v. Guest, 145 N.M. at 701, 204 P.3d at 26.

The Supreme Court of New Mexico has defined probable cause in the malicious abuse of process context as "a reasonable belief, founded on known facts established after a reasonable pre-filing investigation that a claim can be established to the satisfaction of a court or jury." Fleetwood Retail Corp. of N.M. v. LeDoux, 142 N.M. at 154, 164 P.3d at 36 (internal quotations and citation omitted). "The lack of probable cause must be manifest." Fleetwood Retail Corp. of N.M. v. LeDoux, 142 N.M. at 154, 164 P.3d at 36 (citation omitted). Probable cause is to be judged on the facts as they appeared at the time; it is not to be judged on later-discovered facts. See Weststar Mortg. Corp. v. Jackson, 133 N.M. at 122, 61 P.3d at 831 ("Probable cause . . . is to be judged by facts as they appeared at the time, not by later-discovered facts." (citing Restatement (Second) of Torts § 662 cmt. e (stating that an accusation leading to the initiation of a criminal

proceeding must be based on probable cause, determined as of the time the action was filed)(other citations omitted)).  The existence of probable cause in the underlying proceeding is a question of law to be decided by the court.  See  Weststar Mortg. Corp. v. Jackson, 133 N.M. at 123, 61 P.3d at 832 ("[T]he existence of probable cause in the underlying proceeding, that is, whether the facts amount to probable cause, is a question of law and shall be decided by the trial judge.")(internal quotation marks and citation omitted).  A malicious-abuse-of-process plaintiff who is attempting "to show a lack of probable cause must demonstrate, by the applicable standard of proof, that the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim."  DeVaney v. Thriftway Marketing Corp., 124 N.M. at 522, 953 P.2d at 287.

In Guest v. Berardinelli, 145 N.M. 186, 195 P.3d 353, the Court of Appeals of New Mexico discussed the element of probable cause in the context of a claim for malicious abuse of process. See id. at 190, 195 P.3d at 357.  In determining whether the malicious-abuse-of-process defendants had probable cause to name the malicious-abuse-of-process plaintiff as a party in a previous suit, the Court of Appeals first considered whether the defendants made a prima-facie showing that they performed a reasonable pre-filing inquiry.  See id. at 190, 195 P.3d at 357.  The Court of Appeals found that, before filing the suit, the defendants obtained factual background, including correspondence, medical records, depositions, arbitration discovery, written statements, and that the defendants reviewed the materials and information, analyzed the potential causes of action against the plaintiff, and filed the lawsuits on that basis.  See Guest v. Berardinelli, 145 N.M. at 190, 195 P.3d at 357.  The Court of Appeals found that these actions met the standard for a reasonable pre-filing investigation.   See id. at 190,  195 P.3d at 357.   The Court of Appeals then inquired into whether the defendants made a prima-facie showing that the knowledge they obtained from their pre-filing inquiry supported a reasonable belief that they had grounds to bring their claims.  See

Guest v. Berardinelli, 145 N.M. at 190, 195 P.3d at 357.  In making this inquiry, the Court of

Appeals recognized that probable cause does not require certainty, but is "a standard which we

understand to grant attorneys reasonable latitude in asserting novel claims under New Mexico law."

Guest v. Berardinelli, 145 N.M. at 190, 195 P.3d at 357.  The Court of Appeals found that the

defendants "had a reasonable belief that their claims, some of them novel, could be established to

the satisfaction of a judge or jury," because the defendants had evidence that the plaintiff had

potentially violated New Mexico statutes and had served a subpoena under the judicial authority of

the Second Judicial District Court despite that there was no case pending.  Guest v. Berardinelli, 145

N.M. at 191-92, 195 P.3d 358-59.  The Court of Appeals noted that the fact that the district court

ultimately dismissed the defendants' claims "has no bearing on the question of whether Defendants

had probable cause to file suit."  Guest v. Berardinelli, 145 N.M. at 192, 195 P.3d at 359 (citing

DeVaney v. Thriftway Mktg. Corp., 124 N.M. at 521, 953 P.2d at 286 ("[F]avorable termination is

not an element of an action for malicious abuse of process . . . .")).  The Court of Appeals

expounded on this statement:

> This is particularly true when evaluating probable cause in the context of MAP suits
> against attorneys.  In Durham, we relied on the notions that attorneys have some
> measure of freedom in representing their clients, and we did not want to chill an
> attorney's vigorous representation of the client; accordingly, except in unusual
> circumstances, an attorney should not have to worry about asserted duties to
> non-clients. Durham[v. Guest], 2007-NMCA-144, ¶¶ 20-22, 142 N.M. 817, 171 P.3d
> 756.  Out-of-state authority supports application of this principle to the issue of
> probable cause in [malicious-abuse-of-process] cases against attorneys.   The
> California Supreme Court recently stated, "Only those actions that any reasonable
> attorney would agree are totally and completely without merit may form the basis for
> a malicious prosecution suit."  Zamos v. Stroud, 32 Cal.4th 958, 12 Cal.Rptr.3d 54,
> 87 P.3d 802, 810 (2004).
>
> Similarly, the Connecticut Supreme Court said, "'The vitality of our common law
> system is dependent upon the freedom of attorneys to pursue novel, although
> potentially unsuccessful, legal theories.'"  Falls Church Group, Ltd. v. Tyler, Cooper
> & Alcorn, LLP, 281 Conn. 84, 912 A.2d 1019, 1032 (2007) (quoting Wong v. Tabor,

-23-

422 N.E.2d 1279, 1288 (Ind. Ct. App.1981)).  These pronouncements are consistent with our own Rules of Professional Conduct and the ABA Comment printed immediately following in our annotated rules volumes. <u>See</u> Rule 16-301 NMRA ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); <u>see also</u> Rule 16-301 ABA cmt. ("The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail.").

It would be inconsistent with these authorities to require plaintiffs' attorneys, such as [the defendants in this case], to interview and investigate the defendant, [the plaintiff in this case], and her witnesses and then disregard what their own client told them.  <u>It would be inconsistent with the attorneys' professional duty to zealously advocate for their clients were we to hold [the defendants] to the standard [the plaintiff] proposes</u>.

<u>Guest v. Berardinelli</u>, 145 N.M. at 192, 195 P.3d at 359 (emphasis added).

Lack of probable cause is not the only way to establish misuse of process; a plaintiff can also show misuse of process by pointing to "some irregularity or impropriety suggesting extortion, delay or harassment."  <u>DeVaney v. Thriftway Mktg. Corp.</u>, 124 N.M. at 522, 953 P.2d at 287.  A plaintiff may prove misuse of process through procedural irregularity -- such as misuse of discovery, subpoenas, and attachments -- or an act that otherwise indicates wrongful use of proceedings -- such as an extortion attempt.  <u>See DeVaney v. Thriftway Mktg. Corp.</u>, 124 N.M. at 522, 953 P.2d at 287.  Some examples of misuse of process include: (i) excessive execution on a judgment; (ii) attachment of property other than the property involved in the litigation; (iii) oppressive conduct in connection with an arrest or seizure of property; and (iv) extortion of excessive sums of money.  <u>See DeVaney v. Thriftway Mktg. Corp.</u>, 124 N.M. at 522, 953 P.2d at 287.

Under the requirement of a primary improper motive, it is insufficient that the malicious-abuse-of-process defendant acted with ill will or spite.  <u>See DeVaney v. Thriftway Mktg. Corp.</u>, 124

-24-

N.M. at 522, 953 P.2d at 287 (citing <u>W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen</u>, <u>Prosser and Keeton on the Law of Torts</u> § 121, at 897 (5th ed. 1984)("[E]ven a pure spite motive is not sufficient where process is used only to accomplish the <u>result</u> for which it was created.")(emphasis added)).  There must be a purpose to accomplish an illegitimate end.   <u>See</u> <u>DeVaney v. Thriftway Mktg. Corp.</u>, 124 N.M. at 522, 953 P.2d at 287.  The Supreme Court of New Mexico has given several examples of improper purpose, including: (i) a litigant who pursues a claim knowing that the claim is meritless; (ii) a litigant who pursues a claim primarily to deprive another of the beneficial use of his or her property in a manner unrelated to the merits of the claim; (iii) a litigant who misuses the law primarily for harassment or delay; or (iv) a litigant who initiates proceedings primarily for the purpose of extortion. <u>See</u> <u>DeVaney v. Thriftway Mktg. Corp.</u>, 124 N.M. at 522, 953 P.2d at 287.  An overt misuse of process may support an inference of an improper purpose, but a court may not infer from evidence of an improper purpose alone that there was not probable cause or that there was not a proper use of process.  <u>See</u> <u>DeVaney v. Thriftway Mktg. Corp.</u>, 124 N.M. at 522, 953 P.2d at 287.

## <u>RELEVANT NEW MEXICO LAW REGARDING A PHYSICIAN'S EX PARTE CONTACTS WITH A WORKER'S EMPLOYER AND THE EMPLOYER'S INSURER</u>

In <u>Smith v. Ashby</u>, 106 N.M. 358, 743 P.2d 114 (1987), the Supreme Court of New Mexico issued a writ of superintending control prohibiting the Honorable Philip Ashby, District Judge, from enforcing an order that compelled the plaintiff to sign a document authorizing his personal physician to disclose all information regarding the plaintiff in the physician's possession to the defense counsel either out of the presence of the plaintiff or of his attorneys.  <u>See</u> 106 N.M. at 359-60, 743 P.2d at 115-16.  The Supreme Court stated:

> This Court has long recognized the relationship of trust and confidence between a physician and patient.  <u>Woods v. Brumplop</u>, 71 N.M. 221, 377 N.M. 520 (1962).  In

Petrillo v. Syntex Laboratories, Inc., 148 Ill. App.3d 581, 102 Ill. Dec. 172, 499 N.E.2d 952 (1986), the Illinois appellate court joined the "growing number of courts which have found that public policy strongly favors the confidentiality of the physician-patient relationship and thereby prohibits, because of the threat posed to the sanctity of that relationship, extra-judicial ex parte discussion of a patient's medial confidences." Id. 102 Ill. Dec. at 177, 499 N.E.2d at 957. Further, "we find it difficult to believe that a physician can engage in an ex parte conference with the legal adversary of his patient without endangering the trust and faith invested in him by his patient." Id. 102 Ill. Dec. at 182, 499 N.E.2d at 962.

> Society's interest in preserving the confidential nature of the physician-patient relationship is, through our decision to bar ex parte conferences, also fostered by members of the public who look to the court system for justice will know that although they have consented to the release of information regarding the condition placed at issue, they have not, by instituting litigation, automatically consented to a complete breakdown of the trust and confidentiality embodied in the physician-patient relationship.

Id. 102 Ill. Dec. at 187, 499 N.E.2d at 967.  We agree with Petrillo that public policy dictates that practices and procedures in litigation should not allow for unnecessary breakdown of the trust and confidentiality embodied in the physician-patient relationship.  As we have noted, this is not a question of privilege, for there is no longer a physician-patient privilege in New Mexico.  Rather, this is a recognition that it is neither good nor necessary, particularly under the facts of this case, that litigants perceive their privacy interests and other personal relationships threatened by court-ordered ex parte encroachments by the opposing party.

Smith v. Ashby, 106 N.M. at 359-60, 743 P.2d at 115-16.[27]

In Church's Fried Chicken No. 1040 v. Hanson, 114 N.M. 730, 845 P.2d 824 (Ct. App. 1992), the Court of Appeals of New Mexico addressed whether the district court erred in issuing an order prohibiting the employer's workers' compensation insurer from engaging in ex parte contacts with the worker's treating physician.  114 N.M. at 731, 845 P.2d at 825.  The Court of Appeals

---

[27] The Court notes that, at present, rule 11-504 of the New Mexico Rules of Evidence provides that "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnoses or treatment of the patient's physical, mental or emotional condition . . . among the patient, the patient's physician or psychotherapist, or persons who are participating in the diagnosis or treatment . . . ." Rule 11-504 NMRA.

found that the Supreme Court's rationale in <u>Smith v Ashby</u>, that a patient's trust and faith in physicians would be endangered if physicians could engage in ex parte discussions with the patient's legal adversaries, applied to workers' compensation actions.  <u>See</u> <u>Church's Fried Chicken No. 1040 v. Hanson</u>, 114 N.M. at 735, 845 P.2d at 829.  The Court of Appeals thus concluded that the public-policy considerations that the Supreme Court of New Mexico recognized in <u>Smith v. Ashby</u> supported the district court's authority to restrict ex parte discovery of the worker's treating physician.  <u>See</u> <u>Church's Fried Chicken No. 1040 v. Hanson</u>, 114 N.M. at 735, 845 P.2d at 829.

In <u>Gomez v. Nielson's Corp.</u>, 119 N.M. 670, 894 P.2d 1026 (Ct. App. 1995), the Court of Appeals reversed an order that a Workers' Compensation Judge issued which held that the worker's employer and the employer's insurer, through its agent, could have contact with the worker's physician outside the presence of the worker's counsel.  <u>See</u> 119 N.M. at 671, 675, 894 P.2d at 1027, 1031.  The insurer argued that its agent was not the worker's adversary and thus <u>Church's Fried Chicken No. 1040 v. Hanson</u> did not apply.  <u>See</u> <u>Gomez v. Nielson's Corp.</u>, 119 N.M. at 673, 894 P.2d at 1029.  The Court of Appeals found that, for the purposes of communicating with the worker's treating physician, the insurer's agent was in the same position as the insurer, and therefore <u>Church's Fried Chicken No. 1040 v. Hanson</u> applied.  <u>See</u> <u>Gomez v. Nielson's Corp.</u>, 119 N.M. at 673, 894 P.2d at 1029.  The Court of Appeals reversed the order, because it allowed ex parte communications with the worker's legal adversaries, and stated that the worker's employer, the employer's insurer, and the insurer's agents "may not engage in ex parte contacts with [the] worker's treating physician, but must instead secure the permission or presence of the worker or worker's legal representative before discussing matters with the treating physician."  <u>Gomez v. Nielson's Corp.</u>, 119 N.M. at 675, 894 P.2d at 1031.

The Workers' Compensation Handbook For New Mexico informs workers that they are

required to sign a medical release that authorizes their physicians to provide claim representatives with written medical reports and other written communication as "a condition of receiving workers' compensation benefits."  Workers' Compensation Handbook for New Mexico at 13, Exhibit 1 to Loman's Letter.  The Workers' Compensation Handbook, however, also informs workers that New Mexico law restricts communications between their employers, claim representatives, or case managers and their physicians, in the absence of their permission.  See Workers' Compensation Handbook at 13.  The Workers' Compensation Handbook reflects the state of the law after Church's Fried Chicken No. 1040 v. Hanson and Gomez v. Nielson's Corp.

## RELEVANT NEW MEXICO LAW REGARDING CONSENT

For an agreement to be binding, it must be accepted.  See Medina v. Sunstate Realty, Inc., 119 N.M. 136, 138, 889 P.2d 171, 173 (1995).  "Acceptance must be clear, positive, and unambiguous." DeArmond v. Halliburton Energy Servs., Inc., 134 N.M. 630, 635, 81 P.3d 573, 578 (Ct. App. 2003).  The Supreme Court of New Mexico has stated that "[e]ach party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it, and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby." Smith v. Price's Creameries, Div. of Creamland Dairies, Inc., 98 N.M. 541, 545, 650 P.2d 825, 829 (1982).  The Court has not been able to find any New Mexico cases that explore, in the workers' compensation context, what is necessary for a worker to validly consent to ex parte contact between the worker's treating physician and the worker's employer, the employer's insurer, or claim representatives.  The Court will thus consider other areas of New Mexico law that may be illustrative.

New Mexico courts have considered the validity of mandatory-arbitration provisions contained in agreements.  See Fiser v. Dell Computer Corp., 144 N.M. 464, 467, 188 P.3d 1215, 1218 (2008).  New Mexico courts have stated that a mandatory-arbitration provision might be

unenforceable if the contract which contains the provision is an adhesion contract whose terms are patently unfair to the weaker party.  See Cordova v. World Fin. Corp. of N.M., 146 N.M. 256, 265, 208 P.3d 901, 910 (2009).  The Supreme Court of New Mexico has stated:

> Three elements must be satisfied before an adhesion contract may be found. First, the agreement must occur in the form of a standardized contract prepared or adopted by one party for the acceptance of the other. Second, the party proffering the standardized contract must enjoy a superior bargaining position because the weaker party virtually cannot avoid doing business under the particular contract terms. Finally, the contract must be offered to the weaker party on a take-it-or-leave-it basis, without opportunity for bargaining.

146 N.M. at 265, 208 P.3d at 910 (quotation omitted).  "A party may be deemed unable to avoid doing business under the terms of a standardized form contract when the dominant contracting party has monopolized the relevant geographic market or when all the competitors of the dominant party use essentially the same contract terms." Guthmann v. LaVida Llena, 103 N.M. 506, 509, 709 P.2d 675, 678 (1985), overruled on other grounds by Cordova v. World Fin. Corp. of N.M., 146 N.M. 256, 208 P.3d 901.  "An absence of opportunity to bargain is relevant only where the weaker party to a standard form contract objects or has reason to object to one or more of the contract terms." Guthmann v. LaVida Llena, 103 N.M. at 509, 709 P.2d at 678.

In the context of a medical malpractice actions, New Mexico courts have stated that the relationship "between a physician and his patient is one of trust and confidence and that the physician has the duty to make a full and frank disclosure to the patient of all pertinent facts relative to his illness and the treatment prescribed or recommended therof."  Woods v. Brumlop, 71 N.M. 221, 227, 377 P.2d 520, 524 (1962).  The purpose for this rule is to give the patient a basis upon which to determine whether he or she will consent to the treatment.  See id. at 227, 377 P.2d at 524.  "Without the disclosure by the doctor it is said that the patient is not informed and that, therefore, any consent obtained is ineffectual."  Id. at 227, 377 P.2d at 524.

Rule 16-106 of the New Mexico Rules of Professional Conduct prohibits lawyers from revealing "information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted [under the Rules of Professional Conduct]." Rule 16-106 NMRA. The New Mexico Rules of Professional Conduct define informed consent as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Rule 16-100 NMRA.

## RELEVANT NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages. See Herrera v. Quality Pontiac, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86 (2003). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." Ramirez v. Armstrong, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983), overruled on other grounds by Folz v. State, 110 N.M. 457, 460, 797 P.2d 246, 249 (1990). Generally, negligence is a question of fact for the jury. See Schear v. Bd. of County Comm'rs, 101 N.M. 671, 672, 687 P.2d 728, 729 (1984). "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Id. at 672, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." Id. at 672, 687 P.2d at 729 (citation omitted).

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owed a duty to the plaintiff. See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186. The New Mexico courts have recognized that, "[u]ltimately, a duty

exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 134 N.M. at 49, 73 P.3d at 187 (internal quotation marks and citation omitted). To determine whether the obligation of the defendant is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 134 N.M. at 48, 73 P.3d at 186.

The Supreme Court of New Mexico has rejected a stringent privity test as the touchstone of an attorney's duty to a non-client. See Leyba v. Whitley, 120 N.M. 768, 773, 907 P.2d 172, 177 (1995). The Supreme Court stated that it is the intent of the attorney and the client to benefit a third party that forms the basis of a malpractice action by the third party. See id. at 773, 907 P.2d at 177. "An attorney has no duty however to protect the interests of a non-client adverse party for the obvious reasons that the adverse party is not the intended beneficiary of the attorney's services and that the attorney's undivided loyalty belongs to the client." Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 106 N.M. 757, 761, 750 P.2d 118, 122 (1988). "Thus, an attorney in discharging professional duties on behalf of his client cannot be held liable for negligence toward an adverse party." Id. at 761, 750 P.2d at 122.

### RELEVANT NEW MEXICO LAW REGARDING PRIMA-FACIE TORT

In Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990), the Supreme Court of New Mexico recognized a cause of action for prima-facie tort. See Schmitz v. Smentowski, 109 N.M. at 396, 785 P.2d at 736. The underlying theory of the prima-facie tort is that a party who intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances. See Schmitz v. Smentowski, 109 N.M. at 394, 785 P.2d at 734.

The elements of a cause of action for prima-facie tort are: (i) commission of an intentional,

lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act.  See Lexington Ins. Co. v. Rummel, 123 N.M. 774, 777, 945 P.2d 992, 995 (1997); UJI 13-1631 NMRA[28] (listing the elements as: (i) that the defendant intentionally did some act; (ii) that the defendant intended that the act would cause harm to the plaintiff or that the defendant knew with certainty that the act would cause harm to the plaintiff; (iii) that the defendant's act was a cause of plaintiff's harm; and (iv) that the defendant's conduct was not justifiable under all circumstances).  In Schmitz v. Smentowski, the Supreme Court of New Mexico emphasized the importance of limiting the cause of action for prima-facie tort because the prima facie tort was not intended to provide a remedy for every intentionally caused harm.  See Schmitz v. Smentowski, 109 N.M. at 394, 785 P.2d at 734.  See also Lexington Ins. Co. v. Rummel, 123 N.M. at 777, 945 P.2d at 995 ("In recognizing prima facie tort, this Court emphasized the importance of limiting the cause of action. . . .  Prima facie tort was not intended to provide a remedy for every intentionally caused harm.").  Because not every intentionally caused harm gives rise to an actionable tort, once a plaintiff establishes intent to injure, the trial court must balance the defendant's act or acts against the justification for the act or acts and the severity of the injury, weighing: (i) the injury, (ii) the culpable character of the conduct, and (iii) whether the conduct is unjustifiable under the circumstances.  See Portales Nat. Bank v. Ribble, 134 N.M. 238, 240, 75 P.3d 838, 840 (Ct. App. 2003).  These three balancing factors were refined into four factors in Beavers v. Johnson Controls World Servs., Inc., 120 N.M. 343, 901 P.2d 761 (Ct. App. 1995), and in the Uniform Jury Instructions.  The Uniform Jury Instructions instruct the jury to weigh four

---

[28] The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.  See State v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994).

factors in determining whether defendant's act was justifiable under the circumstances.  See UJI 13-1631A NMRA.  These factors are: (i) the nature and seriousness of the harm to the plaintiff; (ii) the fairness or unfairness of the means used by the defendant; (iii) the defendant's motive or motives; and (iv) the value to defendant or to society in general of the interests that the defendant's conduct advances.  See UJI 13-1631A NMRA.  If the court finds that there is sufficient evidence to support all four elements in UJI 13-1631, it must then give the jury the balancing factors in UJI 13-1631A, if the Court determines that a reasonable jury could balance the factors and find for the plaintiff.  "The trial court must initially balance these factors and, if it finds that a jury could reasonably find in the plaintiff's favor, the trial court must submit the claim to the jury for its own balancing of the factors."  Portales Nat. Bank v. Ribble, 134 N.M. at 240, 75 P.3d at 840.

In Martinez v. Northern Rio Arriba Electric Co-op, Inc., 132 N.M. 510, 51 P.3d 1164 (Ct. App. 2002), the Court of Appeals of New Mexico performed the balancing test and held that the plaintiff did not make an actionable prima-facie tort claim.  See id. at 517, 51 P.3d at 1171.  The Court of Appeals found that the defendant's conduct had some justification, because: (i) the conduct related to furthering a legitimate business interest; (ii) the means the defendant used were not outside the ambit of legitimate employer behavior; (iii) the evidence did not support the view that the defendant acted maliciously with the intent to cause the injury and without sufficient justification; and (iv) the emotional difficulties the plaintiff experienced because of the defendant's actions did not, on balance, support a claim for prima-facie tort.  See id. at 516-17, 51 P.3d at 1170-71.  The Court of Appeals stated: "We are not persuaded that any of these allegations, or all of them taken together, rise to the level of both behavior and injury that is envisioned by the theory of prima facie tort."  Id. at 517, 51 P.3d at 1171.

The Court has not been able to find a case in which a court held an attorney liable under

prima-facie tort for filing a lawsuit when the attorney had probable cause to file the lawsuit.  In

Guest v. Berardinelli, 145 N.M. 186, 195 P.3d 353 (Ct. App. 2008), the Court of Appeals of New

Mexico discussed the relationship between the malicious-abuse-of-process tort and the prima-facie

tort.  The Court of Appeals affirmed the district court's grant of summary judgment on the plaintiff's

prima-facie-tort claim.  See id. at 188, 195 P.3d at 355.  The district court granted summary

judgment on the plaintiff's prima-facie-tort claim, because the claim relied on the same set of facts

as her malicious-abuse-of-process claim, and because she had not established a genuine issue of

material fact sufficient to defeat summary judgment on her malicious-abuse-of-process claim.  See

id. at 197, 195 P.3d at 364.  In affirming the district court's grant of summary judgment, the Court

of Appeals stated that the plaintiff neither rebutted the district court's finding that her malicious-

abuse-of-process claim and prima-facie-tort claim relied on the same set of facts, nor directed the

Court of Appeals to evidence that created a genuine issue of material fact to overcome summary

judgment on the prima-facie-tort claim.  See Guest v. Berardinelli, 145 N.M. at 198, 195 P.3d at

365.  The Court of Appeals stated:

> We agree with the district court that the same set of facts required to prove lack of
> probable cause and misuse of process in the MAP context are necessary to prove lack
> of justification in the prima facie tort context.  The undisputed facts in our discussion
> of MAP above support a prima facie showing that Defendants' actions were justified
> because Defendants had probable cause to file suit and did not engage in any overt
> misuse of process.  Because Guest does not direct us to a genuine issue of material
> fact requiring determination by a jury, we affirm summary judgment on Guest's
> prima facie tort claim.

Guest v. Berardinelli, 145 N.M. at 198, 195 P.3d at 365.

## RELEVANT NEW MEXICO LAW REGARDING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

New Mexico courts have adopted the approach used in the Restatement (Second) of Torts

§ 46 (1965) in addressing the intentional-infliction-of-emotional-distress tort.  See Trujillo v.

Northern Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 616, 41 P.3d 333, 342 (2001).  To prove an

intentional-infliction-of-emotional-distress claim, a plaintiff must prove: (i) the conduct in question

was extreme and outrageous; (ii) the conduct of the defendant was intentional or in reckless

disregard of the plaintiff; (iii) the plaintiff's mental distress was extreme or severe; and (iv) there

is a causal connection between the defendant's conduct and the claimant's mental distress.  See id.

at 616, 41 P.3d at 342; Jaynes v. Strong-Thorne Mortuary, Inc., 124 N.M. 613, 618, 954 P.2d 45,

50 (1997)(stating that, under New Mexico law, to establish a claim for intentional infliction of

emotional distress, a plaintiff must show that the defendant intentionally or recklessly caused severe

emotional distress through extreme or outrage conduct); UJI 13-1628 NMRA (stating that, to

recover for intentional infliction of emotional distress, the plaintiff must prove: (i) that the conduct

of the defendant was extreme and outrageous under the circumstances; (ii) that the defendant acted

intentionally and recklessly; and (iii) as a result of the defendant's conduct, the plaintiff experienced

severe emotional distress).  Extreme and outrageous conduct is conduct that goes beyond the bounds

of common decency, and that is atrocious and intolerable to the ordinary person.  See UJI 13-1628

NMRA.  The Restatement (Second) of Torts § 46 states:

> It has not been enough that the defendant has acted with an intent which is tortious
> or even criminal, or that he has intended to inflict emotional distress, or even that his
> conduct has been characterized by "malice," or a degree of aggravation which would
> entitle the plaintiff to punitive damages for another tort.  Liability has been found
> only where the conduct has been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts § 46 cmt. d.  Under New Mexico law, "[e]motional distress is severe

if it is of such an intensity and duration that no ordinary person would be expected to tolerate it."

UJI 13-1628 NMRA (internal quotation marks omitted).

## RELEVANT NEW MEXICO LAW REGARDING DAMAGES

In New Mexico, "[a] party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty." Sanchez v. Martinez, 99 N.M. 66, 71-72, 653 P.2d 897, 902-03 (Ct. App.1982).  An award of damages is improper if it is predicated "upon conjecture, guess, surmise or speculation." Sanchez v. Martinez, 99 N.M. at 72, 653 P.2d at 902.  The underlying theory of a damages award is making the injured party whole. See Abbinett v. Fox, 103 N.M. 80, 86, 703 P.2d 177, 183 (Ct. App. 1985); Pub. Serv. Co. of New Mexico v. Jasso, 96 N.M. 800, 802, 635 P.2d 1003, 1005 (Ct. App. 1981)("The theory of damages in New Mexico is to make an injured party whole, not to allow him a profit on damages.").  In computing damages, the object is to afford just and reasonable compensation for the injuries the party sustained. See Abbinett v. Fox, 103 N.M. at 86, 703 P.2d at 183.

Punitive damages do not serve to make an injured party whole, and instead serve the purpose of punishing the tortfeasor for wrongdoing and deterring others from the commission of like offenses.  See Sanchez v. Clayton, 117 N.M. 761, 766, 877 P.2d 567, 572 (1994).  To be liable for punitive damages, a wrongdoer must have a culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level.  See Clay v. Ferrellgas, Inc., 118 N.M. 266, 269, 881 P.2d 11, 14 (1994); UJI 13-1827 NMRA.  For an award of punitive damages, the defendant must have evinced a conscious and deliberate disregard to the interest of others.  See Paiz v. State Farm Fire and Cas. Co., 118 N.M. 203, 211, 880 P.2d 300, 308 (1994).  The Uniform Jury Instructions define malicious conduct as the intentional doing of a wrongful act with knowledge that the act was wrongful.  See UJI 13-1827 NMRA.  The Uniform Jury Instructions define willful conduct as the intentional doing of an act with knowledge that harm may result.  See id.  A defendant's conduct is wanton if he or she acts with utter indifference to or

-36-

conscious disregard for a person's rights or safety.  See id.  New Mexico courts define reckless behavior as the intentional doing of an act with utter indifference to the consequences. Gonzales v. Surgidev Corp., 120 N.M. 133, 145, 899 P.2d 576, 588 (1995).

## ANALYSIS

Defendants Titus and Murphy are entitled to summary judgment dismissing all of Mosley's claims.  Because Titus had probable cause to file the lawsuits against Mosley under New Mexico law, the Court finds that Mosley's claim for malicious abuse of process fails as a matter of law. Because Titus had probable cause to file the lawsuits against Mosley, and was thus properly discharging his professional duties to his clients, the Court finds that, under New Mexico law, Titus did not owe a duty of care to Mosley, and thus Mosley's negligence claim fails as a matter of law. The Court also grants summary judgment on Mosley's claim for prima-facie tort.  Although the Court is not convinced that Guest v. Berardinelli forecloses, as a matter of law, Mosley's price-facie-tort claim, the Court finds that Mosley's prima-facie-tort claim fails as a matter of law.  The Court also grants summary judgment on Mosley's intentional-infliction-of-emotional-distress claim, because the undisputed facts do not establish the required element of extreme or outrageous conduct. The Court also grants summary judgment on Mosley's damages claims, because it has granted summary judgment on all of Mosley's claims against Titus for liability.

I.    **THE COURT WILL APPLY NEW MEXICO LAW REGARDING MALICIOUS- ABUSE-OF-PROCESS, NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, PRIMA-FACIE TORT, AND DAMAGES.**

In his Complaint, Mosley alleges that the Court has jurisdiction over the case because of "the diversity of the parties and the amount in controversy."  Complaint ¶ 6, at 1.  Because the Court has diversity jurisdiction over the case, it will apply New Mexico's choice-of-law rules to determine which state's substantive law applies.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at 496-

97; Pepsi-Cola Bottling Co v. PepsiCo., Inc., 431 F.3d at 1255.  New Mexico courts characterize the claims at issue -- malicious abuse of process, negligence, intentional infliction of emotional distress, and prima-facie tort -- as tort claims.  See DeVaney v. Thriftway Marketing Corp., 124 N.M. at 518, 953 P.2d at 283 (malicious abuse of process); Leyba v. Whitley, 120 N.M. at 772, 907 P.2d at 176 (negligence); Schmitz v. Smentowski, 109 N.M. at 394, 785 P.2d at 734 (prima-facie tort); Castillo v. City of Las Vegas, 145 N.M. 205, 211, 195 P.3d 870, 877 (Ct. App. 2008)(intentional infliction of emotional distress).  The Court will apply New Mexico law, because New Mexico is the state where the alleged wrong took place.  See Complaint ¶¶ 10-30, at 2-4; Torres v. State, 119 N.M. at 613, 894 P.2d at 390 (stating that, in tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place).  Here, all the alleged elements took place in Farmington.  See Complaint ¶¶ 7-30, at 2-4.

## II.   THE COURT WILL GRANT SUMMARY JUDGMENT ON MOSLEY'S CLAIM FOR MALICIOUS ABUSE OF PROCESS.

The Court will grant summary judgement on Mosley's claim for malicious abuse of process, because it finds that, at the time Titus filed the lawsuits, he had a reasonable belief based on the facts and law known to him that he could enforce the rights of his clients through the courts.  In support of their Motion for Summary Judgment, the Defendants argue that Mosley's malicious-abuse-of-process claim fails as a matter of law, because Titus had probable cause to file the lawsuits and because his primary purpose in filing the lawsuits was to access the remedies of the judicial system on behalf of his clients.  See Memorandum at 12. The Defendants argue that Titus had probable cause to file the lawsuits, because he believed that Mosley's ex parte contacts violated his clients' rights under New Mexico law.  See Memorandum at 11.  The Defendants also contend that Titus did not have an improper motive in filing the lawsuits and that, even if he had a malicious motive

-38-

in filing the suits, "any motive of driving Mosley out of town was secondary to the primary, proper motive of obtaining legal redress for his clients for Mosley's improper *ex parte* contacts." Memorandum at 11-12.

Mosley contends that his malicious-abuse-of-process claim should survive summary judgment, because Titus filed the claims without probable cause and with the primary purpose of harassing Mosley. See Response at 6-7. Mosley contends that Titus did not have probable cause to file the lawsuits because Church's Fried Chicken No. 1040 v. Hanson prohibits only oral communications with workers' employers in the absence of workers' consent and Mosley's practice was to obtain the workers' consent through the release forms. See Response at 7. Mosley argues that Titus testified that he knew there was no cause of action that would have allowed his clients to recover, demonstrating that he had no probable cause. See Response at 7-8. Mosley also argues that the fact that Titus dismissed his claims as soon as Mosley left Farmington, and took no meaningful action to prosecute the claims once they were filed, suggests that he had no interest in creating new law, which further supports Mosley's contention that Titus did not have probable cause. See Response at 8. Mosley further contends that there is "ample evidence that Titus' objective in filing thirteen complaints against Dr. Mosley was to harass and bully him to the point that he would sell his medical practice and leave Farmington." Response at 8. In support of his argument regarding Titus' primary motive, Mosley points to Bible's and Stirling's testimony that Titus told them he wanted to run Mosley out of town, and to Titus' abrupt dismissal of the claims once Mosley left town. See Response at 8.

The Court finds that Mosley has not established genuine issues of material fact, and that Mosley's malicious-abuse-of-process claims fails as a matter of law. The elements of a malicious abuse of process action are: (i) the use of process in a judicial proceeding that would be improper

in the regular prosecution or defense of a claim or charge; (ii) a primary motive in the use of process to accomplish an illegitimate end; and (iii) damages.  See Durham v. Guest, 145 N.M. at 701, 204 P.3d at 26.  An improper use of process may be shown by: (i) filing a complaint without probable cause; or (ii) an irregularity or impropriety suggesting extortion, delay or harassment, or other conduct formerly actionable under the tort of abuse of process.  See Durham v. Guest, 145 N.M. at 701, 204 P.3d at 26.

The parties disagree whether Titus had probable cause to file the lawsuits against Mosley. Probable cause in the malicious-abuse-of-process context means "a reasonable belief, founded on known facts established after a reasonable pre-filing investigation that a claim can be established to the satisfaction of a court or jury." Fleetwood Retail Corp. of N.M. v. LeDoux, 142 N.M. at 154, 164 P.3d at 36.  The Court concludes that Titus performed a reasonable pre-filing inquiry.  See Guest v. Berardinelli, 145 N.M. at 190, 195 P.3d at 357.  The undisputed facts establish that, before filing suit, Titus learned that Mosley was engaging in ex parte contacts with the employers of Titus' clients.  Titus knew that, when patients arrived at Mesa Occupational and Sports Medicine, the receptionist gave them a packet of paperwork, which included a release that, when signed, purported to permit Mosley to contact his patient's employers.  Mosley would discuss the forms with patients only if the patients had a question about one of the forms.  Titus was also aware that Mosley's ex parte contacts resulted in adverse employment consequences for Titus' clients.  Upon learning this information, Titus advised Mosley he believed this contact was improper and asked him to cease contacting the employers of Titus' clients.  Mosley continued engaging in ex parte contact after Titus' letters.  The Court finds that, by obtaining this information and analyzing whether Mosley was acting properly, Titus conducted a sufficient pre-filing inquiry.  See Guest v. Berardinelli, 145 N.M. at 190, 195 P.3d at 357 (finding that the defendant conducted a sufficient pre-filing

investigation when the defendant obtained factual background -- including correspondence, medical records, depositions, written statements -- and reviewed the materials and information, and analyzed the potential causes of action against the plaintiff).

The Court finds that the knowledge that Titus obtained in his pre-filing inquiry supported a reasonable belief that he had grounds to bring the claims against Mosley. Mosley contends that, because Church's Fried Chicken No. 1040 v. Hanson and Gomez v. Nielson's Corp. prohibit only ex parte contact absent the worker's consent, and because he gave patients a release to sign, Titus could not have a reasonable belief that he had grounds to bring the claims. Titus knew, however, that Mosley was engaging in ex parte contacts with several of his clients' employers and the employer's insurers, and that the clients were suffering adverse consequences as a result of these contacts. Titus also knew that Mosley provided a release to his patients, which, if signed, allowed Mosley to discuss the worker's case with his employer or insurer. The Court nevertheless finds that Titus could have had a reasonable belief that  Church's Fried Chicken No. 1040 v. Hanson and Gomez v. Nielson's Corp. provided his clients with a right that protected against disclosure of confidential information they entrusted to Mosley. The two opinions contain language stating that ex parte discussions of a patient's medical confidences should be prohibited, because public policy strongly favors confidentiality of the information to preserve the physician-patient relationship. See Church's Fried Chicken No. 1040 v. Hanson, 114 N.M. at 735, 845 P.2d at 829 ("[P]ublic policy strongly favors the confidentiality of the physician-patient relationship and thereby prohibits, because of the threat posed to the sanctity of that relationship, extra-judicial ex parte discussion of a patient's medical confidences.")(citation omitted); Gomez v. Nielson's Corp., 119 N.M. at 675, 894 P.2d at 1031 (stating that employers and insurers "may not engage in ex parte contacts with [the] worker's treating physician"). Upon studying the language in these opinions, Titus could have

-41-

reasonably believed that New Mexico case law provided workers with a judicially enforceable right protecting against disclosure of information they entrusted to their treating physicians. See Beals v. Ares, 25 N.M. 459, 166, 185 P. 780, 787 (1919)("All students of the law are familiar with the source of the common law, which likewise gives rights and designates wrongs of every description and provides remedies for public and private redress.  Under either system, . . . for every right there was a remedy.")(citation omitted).  See also 1 Am. Jur. 2D Actions § 35 (2005)("It is a principle of the common law that wherever the law gives a right . . . , it also gives a remedy.").

The Court finds that an attorney could have had a reasonable belief that the workers did not give valid consent to the ex parte contacts.  Mosley provided the release in a packet of papers, and discussed the release with the workers only if asked.  An attorney could have had a reasonable belief that Mosley did not obtain valid consent by providing the release to the workers in this manner, based on New Mexico law in areas such as mandatory arbitration provisions, medical malpractice, and client-lawyer relationships.  See Cordova v. World Fin. Corp. of N.M., 146 N.M. at 265, 208 P.3d at 910 (stating that a mandatory arbitration provision might be unenforceable if the contract that contains the arbitration provision is an adhesion contract whose terms are patently unfair to the weaker party); Woods v. Brumlop, 71 N.M. at 227, 377 P.2d at 524 (stating that the relationship "between a physician and his patient is one of trust and confidence and that the physician has the duty to make a full and frank disclosure to the patient of all pertinent facts relative to his illness and the treatment prescribed or recommended therof"; if the patient is not informed "any consent obtained is ineffectual").

There is no evidence that Mosley highlighted his release form in any way.  He did not flag it for any more attention than any other form in the stack.  See Mosley Depo. at 67:9-11 ("[Patients] would see the receptionist first. . . .  She would give them a packet of paperwork to fill out, one of

the pages being [the release].").  There is no indication that the release itself highlighted the waiver; nothing is in bold, italics, or large print to jump out at the patient.  <u>See</u> Authority to Release Medical Reports and Information at 1.  Titus could have reasonably assumed that a patient would sign the entire stack without much thought that the release was of any particular importance.  Moreover, there was no effort by Mosley or his staff to talk to the patient about the release before its execution. The burden was on the patient to leave his or her chair in the waiting room, and ask the receptionist or nurse about the release before Mosley or his staff talked to the patient about the release.  <u>See</u> Mosley Depo. at 39:8-9 ("If somebody had a question [about the release], we would read it to them . . . .").  Given the trend of New Mexico law in certain areas of consumer rights, arbitration, informed consent in the medical context, and informed consent in other areas including other professionals, an objectively reasonable attorney could have concluded that Mosley's handling of the release did not rise to the level of informed consent in this developing area of the law.  Other than a relatively old Supreme Court case and two Court of Appeals cases, there is little in this area of law.  A reasonably objective attorney would naturally try to extrapolate from other areas; Mosley might use the more rigid and demanding area of contract law, while Titus might look at the developing New Mexico law on arbitration and informed consent involving professionals and their clients.  The Court finds that, based on New Mexico law, an attorney could reasonably believe that the workers did not provide valid consent to Mosley's ex parte contacts.  Although New Mexico contract law states that "[e]ach party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it, and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby," <u>Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.</u>, 98 N.M. at 545, 650 P.2d at 829, it is possible that a New Mexico court would not apply this principle in the context of a worker's consent to his physician's ex parte communications with his or her

employer, or with his or her employer's insurer.

The Court finds that, based on New Mexico law in this area and in other areas, Titus had a reasonable belief that his clients had a right protecting against disclosure of information his clients entrusted to Mosley, and that their consent to Mosley's ex parte communications was not valid. Although the New Mexico courts have not yet said Titus had a cause of action through which he could enforce the rights that he believed existed, because the probable cause standard for malicious abuse of process does not require certainty, Titus had reasonable latitude in asserting this novel claim -- meant to protect his clients' rights.  See Guest v. Berardinelli, 145 N.M. at 190, 195 P.3d at 357 (stating that probable cause does not require certainty, because probable cause is "a standard which we understand to grant attorneys reasonable latitude in asserting novel claims under New Mexico law")(citation omitted).  Titus knew his clients had a right.  He had a reasonable basis to believe the release was not adequate consent.  It was not a great leap for him to think that he could enforce that right in court.  New Mexico courts eschew the doctrine of a right without a remedy. See Beals v. Ares, 25 N.M. 459, 166, 185 P. 780, 787 (1919)("All students of the law are familiar with the source of the common law, which likewise gives rights and designates wrongs of every description and provides remedies for public and private redress.  Under either system, . . . for every right there was a remedy.")(citation omitted).  See also 1 Am. Jur. 2D Actions § 35 (2005)("It is a principle of the common law that wherever the law gives a right . . . , it also gives a remedy.").  Even if he could not collect damages, he might be able to obtain injunctive relief, which is available in New Mexico even when damages are not available.  Cf. Copar Pumice Co., Inc. v. Morris, No. 07-CV-0079, 2009 WL 2424567, at *6 (D.N.M. July 9, 2009)(Browning, J.)(agreeing with the plaintiff's concession that it may seek only injunctive relief and not monetary damages for a state constitutional violation); Decker v. City of Indianapolis, No. IP-01-1885-C-B/S, 2002 WL 1585622,

-44-

at *1 n.1 (S.D. Ind. July 17, 2002)(granting the defendant's motion to dismiss to the extent that the plaintiff's claims could be construed as seeking monetary damages under the Indiana Constitution, and not only declaratory and injunctive relief); Brooks v. Sauceda, 85 F. Supp. 2d 1115, 1128 (D. Kan. 2000)("The Court also dismisses plaintiff's state constitutional claims.  First, plaintiff only seeks monetary damages for the alleged violations of state law -- he does not seek declaratory judgment or injunctive relief for any of his state constitutional claims.").

Titus pursued a potentially unsuccessful theory in fully representing his clients, a freedom that New Mexico courts have emphasized as important.  See Guest v. Berardinelli, 145 N.M. at 192, 195 P.3d at 359 ("[W]e have relied on the notions that attorneys have some measure of freedom in representing their clients . . . .   The vitality of our common law system is dependent upon the freedom of attorneys to pursue novel, although potentially unsuccessful, legal theories.")(citations omitted).  The Court thus finds that it "would be inconsistent with the attorneys' professional duty to zealously advocate for their clients" to hold Titus liable for malicious abuse of process, when he had a reasonable belief based on the facts and law known to him that he could enforce the rights of his clients through the courts.  See id. at 192, 195 P.3d at 359.  That Titus dismissed his claims as soon as Mosley left Farmington, and took no meaningful action to prosecute the claims once they were filed does not suggest that he did not have probable cause to file the lawsuits, because probable cause is judged on the facts as they appeared at the time the lawsuit was filed.  See Weststar Mortg. Corp. v. Jackson, 133 N.M. at 122, 61 P.3d at 831 ("Probable cause . . . is to be judged by facts as they appeared at the time, not by later-discovered facts." (citing Restatement (Second) of Torts § 662 cmt. e (stating that the initiation of a criminal prosecution must be based on probable cause determined as of the time the action was filed)).

Titus' claim for malicious abuse of process fails as a matter of law, because Titus has failed

-45-

to establish one of the necessary elements of a malicious-abuse-of-process claim -- the element of improper use of process.  See Durham v. Guest, 145 N.M. at 701, 204 P.3d at 26 (stating that the elements of a malicious-abuse-of-process action are: (i) the use of process in a judicial proceedings that would be improper in the regular prosecution or defense of a claim or charge; (ii) a primary motive in the use of process to accomplish an illegitimate end; and (iii) damages).  The Court will therefore grant summary judgment on Mosley's malicious-abuse-of-process claim.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (stating that, to avoid summary judgment, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party). The Court need not address whether the undisputed evidence establishes that Titus' primary motive in filing the lawsuits was to accomplish an illegitimate end, because it has already concluded that Titus had probable cause to file the lawsuits -- meaning that Mosley's malicious-abuse-of-process claim fails as a matter of law.

## III.   THE COURT WILL GRANT SUMMARY JUDGMENT ON MOSLEY'S NEGLIGENCE CLAIM.

The Court will grant summary judgement on Mosley's negligence claim, because it finds that Titus did not owe a duty to Mosley.  In support of their Motion for Summary Judgment, the Defendants argue that the Court should grant summary judgment as a matter of law on Mosley's claim of professional negligence.  See Memorandum at 12.  The Defendants assert that there is no evidence of a breach of duty, because Titus informed his clients as to the purpose of the lawsuits against Mosley, and that the clients consented to the filing and prosecution of the lawsuits.  See Memorandum at 12-13.  The Defendants assert that, even if there was evidence of a breach of duty by Titus, Mosley has no standing to assert any claim for the alleged breach of duty, because, under New Mexico law, Titus did not owe a duty to Mosley.  See Memorandum at 13.  The Defendants

-46-

assert that an attorney has no duty to protect the interests of a non-client adverse party.  <u>See</u> Memorandum at 13.

Mosley contends that the general rule that a lawyer does not owe a duty towards an adverse party is qualified by the assumption that the attorney is acting legally and ethically.  <u>See</u> Response at 9. Mosley contends that, because the issue whether Titus acted within the rules of law and ethics is before the Court, if Titus exceeded the bounds of the rules of law and ethics by filing frivolous complaints, he may be held liable for negligence, as Mosley would be a foreseeable plaintiff.  <u>See</u> Response at 9-10.

The Court will grant summary judgment on Mosley's negligence claim, because it finds that Titus did not owe a duty of care to Mosley.  A finding of negligence is dependent upon the existence of a duty on the part of the defendant.  <u>See</u> <u>Schear v. Bd. of County Comm'rs</u>, 101 N.M. at 672, 687 P.2d at 729.  In the Court's analysis of Mosley's malicious-abuse-of-process claim, the Court found that Titus had probable cause to file the lawsuits against Mosley.  Because Titus had probable cause to file the lawsuits against Mosley, the Court finds that he acted within the bounds of the rules of law and ethics in filing the lawsuits against Mosley.  The lawsuits were not frivolous, because Titus had a reasonable belief that his clients had a right, even if it was not clear that the law provided a remedy.  <u>See</u> Rule 16-301 ("A lawyer shall not bring or defend a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); <u>Guest v. Berardinelli</u>, 145 N.M. at 190, 195 P.3d at 357 (stating that probable cause does not require certainty, "a standard which we understand to grant attorneys reasonable latitude in asserting novel claims under New Mexico law").  Titus was discharging his "professional duty to zealously advocate" for his clients, <u>see</u> <u>Guest v. Berardinelli</u>, 145 N.M. at 192, 195 P.3d at 359, and he "cannot be held liable for negligence toward an adverse

-47-

party" for discharging this professional duty, see Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 106 N.M. at 761, 750 P.2d at 122.  Because Mosley was the adverse party in the litigation that Titus filed, Titus had no duty to protect Mosley's interests.  See id. at 761, 750 P.2d at 122 ("As a matter of public policy in order to maintain and enforce the fidelity and duty of the attorney toward the client, we cannot jeopardize the integrity of the adversarial system by imposing a professional duty on an attorney toward an adverse party.").  Mosley's negligence claim fails as a matter of law, because Titus did not owe Mosley a duty of care.  The Court will therefore grant summary judgment on Mosley's negligence claim.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (stating that, to avoid summary judgment, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party).

## IV.  THE COURT WILL GRANT SUMMARY JUDGMENT ON MOSLEY'S CLAIM FOR PRIMA-FACIE TORT.

The Court will grant summary judgment on Mosley's claim for prima-facie tort.  Although the Court is not convinced that Guest v. Berardinelli forecloses, as a matter of law, Mosley's claim for prima-facie tort, the Court finds that Mosley's prima-facie-tort claim fails as a matter of law. The Defendants contend that, under Guest v. Berardinelli, because the same facts form the basis of Mosley's malicious-abuse-of-process claim and prima-facie-tort claim, and because Mosley's malicious-abuse-of-process claim fails as a matter of law, summary judgment should also be granted on Mosley's prima-facie-tort claim.  See Memorandum at 17.  The Defendants further argue that the undisputed material facts establish that Titus acted justifiably for the benefit of his clients, because he had probable cause to file the lawsuits, and that his actions taken in connection with the lawsuits are privileged as a matter of law.  See Memorandum at 18-19.  Mosley contends that there is a genuine issue of material fact whether Titus filed the claims without sufficient justification, because

-48-

he knew that Church's Fried Chicken No. 1040 v. Hanson only prohibited ex parte contact when the worker did not give the patient consent to do so.  See Response at 10.  Mosley concedes that the facts supporting this claim are the same facts that underlie his malicious-abuse-of-process claim, but asserts that, "if the Court were to find that one of the elements of the [malicious abuse of process] claim were not met, it could still find that a prima facie tort occurred."  Response at 10.

Although Mosley concedes that his malicious-abuse-of-process claim and prima-facie-tort claims rely on the same set of facts, see Response at 10, the Court is not convinced that its grant of summary judgment on Mosley's malicious-abuse-of-process claim automatically forecloses Mosley's prima-facie-tort claim.  The Defendants rely on Guest v. Berardinelli to argue that the Court should grant summary judgment on Mosley's prima-facie-tort claim, because his prima-facie-tort claim relies on the same set of facts as his malicious-abuse-of-process claim, and because Mosley did not establish a genuine issue of material fact to survive summary judgment on his malicious-abuse-of-process claim.[29]  In other words, Titus argues that Guest v. Berardinelli forecloses, as a matter of law, a prima-facie tort claim against an attorney when the attorney had probable cause.  While the Court essentially gets to the same legal conclusion as Titus, and while

---

[29] At the hearing, Mosley's counsel, Eric Loman, stated that he could not distinguish Guest v. Berardinelli from this case.  See Tr. at 62:10-13, 36:6-7 (Loman).  Upon a careful consideration of Guest v. Berardinelli, however, the Court finds that a good argument could be made that the case does not set forth a per se rule that courts must grant summary judgment on prima-facie-tort claims if they find that the plaintiff's prima-facie-tort claim and malicious-abuse-of-process claim are based on the same facts, and they have granted summary judgment on the plaintiff's malicious-abuse-of-process claim.  The Court comes to this conclusion for several reasons.  After a careful consideration of the language in Guest v. Berardinelli, the Court believes that the Court of Appeals' language did not lay down a bright-line rule.  The Court will also refrain from reading Guest v. Berardinelli as broadly as Titus suggests, because the opinion is from the Court of Appeals of New Mexico, and the Court's job is to predict what the Supreme Court of New Mexico would do.  See Wade v. Emcasco Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)("Ultimately, however, the Court's task is to predict what the state supreme court would do.")(citations omitted).

Titus may be reading Guest v. Berardinelli correctly, the Court finds that this case may be distinguishable from Guest v. Berardinelli. In Guest v. Berardinelli, the Court of Appeals affirmed the district court's grant of summary judgment, but only after stating that the plaintiff neither rebutted the district court's finding that her malicious-abuse-of-process claim and prima-facie-tort claims relied on the same facts nor directed the court to evidence establishing a genuine issue of material fact to overcome summary judgment on her prima-facie-tort claim. See Guest v. Berardinelli, 145 N.M. at 197-98, 195 P.3d at 364-65. The Court of Appeals did not go so far as to say that the same set of facts automatically forecloses the prima-facie tort claim. It may be that the Court of Appeals intended to lay down such a bright-line rule, but its language did not say so and it did not present analysis that would support its adopting such a bright-line rule. There is thus a valid basis to deny Titus' broad reading of Guest v. Berardinelli. It may be that the bright-line rule that Titus suggests is a sound one. Nevertheless, the Court will give Guest v. Berardinelli a more conservative reading than does Titus and limit it to its facts. Accordingly, the Court believes that its grant of summary judgment on Mosley's malicious-abuse-of-process claim will not automatically foreclose Mosely's prima-facie-tort claim if Mosley can establish a genuine issue of material fact to overcome summary judgment on his prima-facie-tort claim.

There is another issue related to reading Guest v. Berardinelli as broadly as Titus suggests. The opinion in Guest v. Berardinelli is from the Court of Appeals, and the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it. See Wade v. Emcasco Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)("Ultimately, however, the Court's task is to predict what the state supreme court would do.")(citations omitted). While the Court certainly may and will consider the Court of Appeal's decision in making its determination, the Court is not bound by the Court of Appeal's decision in

the same way that it would be bound by a Supreme Court decision. See Wade v. Emcasco Ins. Co., 483 F.3d at 665-66 ("Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state.")(citations omitted). Nevertheless, the New Mexico Supreme Court denied a writ of certiorari in Guest v. Berardinelli. Moreover, even if the Supreme Court of New Mexico did not adopt as broad a reading of Guest v. Berardinelli as Titus has, the Court is convinced that the Supreme Court would have reached the result that the Court of Appeals in Guest v. Berardinelli reached, and would approve of this Court's analysis of the law.

The Court is not convinced that Titus' actions rise to the level of behavior and injury that is envisioned by the theory of a prima-facie-tort claim. The elements of a cause of action for prima-facie tort are: (i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act. See Lexington Ins. Co. v. Rummel, 123 N.M. at 777, 945 P.2d at 995. Because not every intentionally caused harm gives rise to an actionable prima-facie tort, once intent to injure is established, the trial court must balance the defendant's actions against the justification for the actions and the severity of the injury, weighing: (i) the nature and seriousness of the harm to the plaintiff; (ii) the fairness or unfairness of the means used by the defendant; (iii) defendant's motive or motives; and (iv) the value to defendant or to society in general of the interests advanced by the defendants's conduct. See Beavers v. Johnson Controls World Servs., Inc., 120 N.M. 343, 348, 901 P.2d 761, 767 (Ct. App. 1995); UJI 13-1631A NMRA. The Court may decide this issue as a matter of law. Portales Nat. Bank v. Ribble, 134 N.M. at 240, 75 P.3d at 840 ("The trial court must initially balance these factors and, if it finds that a jury could reasonably find in the plaintiff's favor, the trial court must submit the claim to the jury for its own balancing of the factors.").

Because there is evidence in the record that Titus filed the lawsuits with the intent to injure Mosley, the Court finds that  it is necessary to proceed with the balancing test.  See Kitchell v. Pub. Serv. Co. of New Mexico, 126 N.M. 525, 529, 972 P.2d 344, 348 (1998)("If there is no evidence of an intent to injure, there is no need to proceed with the balancing test.")(internal quotation marks and citation omitted).  After a careful consideration of all the factors, however, the Court determines that there is not sufficient evidence on which the fact-finder could reasonably find for Mosley on his prima-facie-tort claim.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251.  The undisputed facts establish that the lawsuits were not a factor in the negotiations or purchase price that Reliance paid for Mosley's practice, and that Mosley did not lose any patients as a result of the lawsuits, although he did lose some patients to competition from other medical providers.  Based on the lack of evidence showing physical, concrete harm, the nature and seriousness of the harm to Mosley does not appear to be of such a nature that legal redress through a prima-facie-tort claim is appropriate.

The factor regarding the value of the defendant's conduct, to the defendant or to society, primarily concerns determining the existence of justification for the defendant's acts.  See Beavers v. Johnson Controls World Servs., Inc., 120 N.M. at 350, 901 P.2d at 768("[The factor of the nature and significance of the interests promoted by the actor's conduct] is of primary concern in determining the existence of justification for [the defendant's] acts.").  The undisputed facts which establish that Titus had probable cause to file the lawsuits also support a prima-facie showing that Titus' actions were justified, see Guest v. Berardinelli, 145 N.M. at 198, 195 P.3d at 365 ("The undisputed facts in our discussion of MAP above support a prima facie showing that Defendants' actions were justified because Defendants had probable cause to file suit and did not engage in any overt misuse of process."), and Mosley has not directed the Court to any additional facts which establish that Titus did not have sufficient justification to file the lawsuits.  The Court also finds that

Titus did not use means outside the ambit of legitimate behavior.  Titus had probable cause to file the lawsuits, filing lawsuits is not an unfair means, and Mosley has pointed to no evidence that establishes that Titus used improper means in the litigation.

Although there is evidence in the record that Titus filed the lawsuits with an improper motive -- specifically, running Mosley out of Farmington -- the Court believes that the evidence in the record which indicates that Titus' actions in filing the lawsuits were justified outweighs his alleged improper motive.  See Schmitz v. Smentowski, 109 N.M. at 395, 785 P.2d at 735 ("Thus, if a defendant offers a purpose other than the motivation to harm the plaintiff as justification for his actions, that justification must be balanced to determine if it outweighs the bad motive of the defendant in attempting to cause injury.").  While the Court need not adopt Titus' broad reading of Guest v. Berardinelli to dispose of this case, and the Court need not and will not say that there can not be a prima-facie tort when there is probable cause, there are sound reasons for adopting the principle that a broad reading of Guest v. Berardinelli produces.  Cf. Guest v. Berardinelli, 145 N.M. at 192, 195 P.3d at 359 ("Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit.").  Once a defendant has established probable cause, allowing a prima-facie-tort claim may create mischief.  Attorneys bring cases for a number of reasons -- love of publicity, fame, development of the law, interesting facts or law, money, and sometimes even because of ill will toward the defendant.  If a lawyer did not like a public official -- for political reasons or personal hatred -- if he or she has probable cause, it seems nothing is to be gained by not allowing that lawyer to proceeding, but requiring a lawyer with some arguably more pure motive to bring the lawsuit.  Lawyers rarely take a case for one reason.  Society is not improved by having a jury decide whether it likes the lawyer's motive down the road.  While at first blush it may not appear to be very nice to want to run a doctor out of town,

some doctors may need to be run out of town.  It seems the law of probable cause in the malicious-abuse-of-process cases is sufficient protection for society against bad lawyers rather than lay juries functioning as professional panels.

Because the Court finds that Mosley has presented a mere "scintilla" of evidence -- not sufficient evidence on which the fact-finder could reasonably find for him -- the Court will grant summary judgment on Mosley's prima-facie-tort claim.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (stating a mere "scintilla" of evidence will not avoid summary judgment).  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (stating that, to avoid summary judgment, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party); Portales Nat. Bank v. Ribble, 134 N.M. at 240, 75 P.3d at 840 ("The trial court must initially balance these factors and, if it finds that a jury could reasonably find in the plaintiff's favor, the trial court must submit the claim to the jury for its own balancing of the factors.").  Prima-facie torts are meant to provide a remedy for acts committed with an intent to injure the plaintiff and without justification, and the Court finds that, because Titus had sufficient justification to file the lawsuits and because the justifications outweigh his alleged improper motives, Titus' actions do not rise to the level of behavior and injury that is envisioned by the theory of a prima-facie-tort claim.  To allow a prima-facie tort in this situation could contravene society's important interest in having lawyers go about the normal task of shaping the law in novel, developing areas without feeling the chill that allowing prima-facie torts may bring.  No sound reasons suggest allowing the tort for otherwise legal conduct.

## V.    THE COURT WILL GRANT SUMMARY JUDGMENT ON MOSLEY'S CLAIM FOR INTENTIONAL INFLECTION OF EMOTIONAL DISTRESS.

The Court will grant summary judgment on Mosley's claim for intentional infliction of emotional distress, because it finds that the undisputed facts do not establish that Titus' conduct was

extreme and outrageous.  The Defendants allege that summary judgment is appropriate on Mosley's claim for intentional infliction of emotional distress, because Mosley has failed to establish evidence showing that Titus' conduct was extreme and outrageous.  <u>See</u> Memorandum at 19.  Mosley contends that Titus' abuse of the judicial process for the purpose of harassing and embarrassing Mosley was extreme and outrageous.  <u>See</u> Response at 11.  Mosley also contends that he suffered severe emotional distress as a result of the ordeal, as shown by the fact that he moved to a different state.  <u>See</u> <u>id.</u> at 11.

The Court grants summary judgment on Mosley's claim for intentional infliction of emotional distress because the undisputed facts fail to show extreme and outrageous conduct.  To prove an intentional-infliction-of-emotional-distress claim, a plaintiff must prove: (i) the conduct in question was extreme and outrageous; (ii) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (iii) the plaintiff's mental distress was extreme or severe; and (iv) there is a causal connection between the defendant's conduct and the claimaint's mental distress.  <u>See</u> <u>Trujillo v. Northern Rio Arriba Elec. Co-op, Inc.</u>, 131 N.M. at 616, 41 P.3d at 342.  Extreme and outrageous conduct is conduct which goes beyond the bounds of common decency, and is atrocious and intolerable to the ordinary person.  <u>See</u> UJI 13-1628 NMRA.  Although New Mexico courts have not addressed whether an attorney's act of filing a lawsuit can constitute extreme and outrageous conduct, the Court of Appeals of North Carolina has stated that an attorney's act of "sending a letter of demand to an adverse party in anticipation of litigation together with a proposed complaint setting forth the basis of its claim may not be reasonably regarded as extreme and outrageous conduct sufficient to support a claim for intentional infliction of mental distress."  <u>Harris v. NCNB Nat. Bank of North Carolina</u>, 355 S.E.2d 838, 844 (N.C. Ct. App. 1987).  The Court finds that an attorney's act of filing a lawsuit with probable cause is analogous to an attorney's act of

-55-

sending a demand letter that setting forth the basis of its claim.  The Court finds that neither act -- without more -- rises to the level of being beyond the bounds of common decency.

New Mexico courts have stated that common occurrences -- without more -- rarely rise to the "level of being beyond all possible bounds of decency and utterly intolerable in a civilized community."  Trujillo v. Norther Rio Arriba Elec. Co-op, Inc., 131 N.M. at 617, 41 PP.3d at 343 ("Being fired is a common occurrence that rarely rises to the level of being beyond all possible bounds of decency and utterly intolerable in a civilized community.")(internal quotation marks omitted).  Filing a lawsuit, like firing an employee, is a common occurrence that -- by itself -- does not rise to the level of being beyond all possible bounds of decency and utterly intolerable in a civilized community.  On the contrary, New Mexico law encourages attorneys to bring novel claims by protecting them against tort claims -- such as malicious abuse of process -- when they have probable cause to file the suit.  See Guest v. Berardinelli, 145 N.M. at 190, 195 P.2d at 357 ("[F]iling of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for [malicious abuse of process], even if it is the result of a malicious motive.")(citation omitted).  Because the undisputed facts establish that Titus had probable cause to file the lawsuits, the Court is not convinced that Titus' act of filing the lawsuits -- without more -- rises to the level of extreme and outrageous conduct.  The Court thus finds that Mosley has not established a genuine issue of material fact that Titus' conduct was extreme and outrageous.  Because extreme and outrageous conduct is a necessary element for an intentional infliction of emotional distress claim cause of action, Mosley's claim for intentional infliction of emotional distress fails as a matter of law.  The Court will therefore grant summary judgment on Mosley's claim for intentional infliction of emotional distress.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (stating that, to avoid summary judgment, there must be sufficient evidence on

which the fact-finder could reasonably find for the nonmoving party).

## VI.   THE COURT WILL GRANT SUMMARY JUDGMENT ON MOSLEY'S DAMAGES CLAIMS.

The Court will grant summary judgment on Mosley's damages claims.  The Defendants contend that the Court should grant summary judgment on Mosley's claims that Titus' filing of the lawsuits against Mosley resulted in the loss of value of Mosley's business, because the undisputed testimony is that Titus' actions did not impact the valuation or sale of Mosley's business.  See Memorandum at 20-21.  The Defendants also contend that the Court should grant summary judgment on Mosley's claims for punitive damages, because the evidence fails to establish culpability on Titus' part that can form a basis for a punitive damages award.  See Memorandum at 21.  Mosley contends that, although his practice was worth more than for what he sold it, he sold it so that he could get away from Farmington.  See Response at 11-12.  Mosley also contends he is entitled to punitive damages if any of his three intentional tort claims are successful.  See Response at 12. Mosley's allegations regarding the loss of value of his practice are contained in Count II of his Complaint, which alleges claims for negligence and violations of the New Mexico Antitrust Act. See Complaint ¶¶ 44, 48-49, at 5, 6.  Because Mosley conceded that summary judgment should be granted on his claim under the New Mexico Antitrust Act, and because the Court has granted summary judgment on Mosley's negligence claim, the Court will grant summary judgment on Mosley's claims for damages based on the loss of value of his practice.  The Court will also grant summary judgment on Mosley's claim for punitive damages, because it has dismissed Mosley's claims for malicious abuse of process, prima-facie tort, and intentional infliction of emotional distress.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment, filed July 21, 2010

(Doc. 50) is granted.

                                              _____
                                              UNITED STATES DISTRICT JUDGE

*Counsel:*

Sam Bregman
Eric Loman
Bregman & Loman, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Richard L. Gerding
Gerding & O'Loughlin
Farmington, New Mexico

--and--

Alfred L. Green , Jr.
Robert T. Booms
Emily A. Franke
Butt Thornton & Baehr, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendants*